# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | |
|---|---|
| **GRACE CHRISTIAN LIFE**, a registered student organization at North Carolina State University, <br><br> Plaintiff, <br><br>     v. <br><br> **W. RANDOLPH WOODSON**, Chancellor of North Carolina State University, in his official and individual capacities; **WARWICK A. ARDEN**, Provost and Executive Vice Chancellor, in his official and individual capacities; **TJ WILLIS**, Associate Director of University Student Centers, in his official and individual capacities; **MIKE GIANCOLA**, Associate Provost, in his official and individual capacities; <br><br> Defendants. | Case No. <br><br> **VERIFIED COMPLAINT** <br><br> **Jury Trial Requested** |

Plaintiff Grace Christian Life, by and through counsel, and for its Complaint against the Defendants, hereby states as follows:

## INTRODUCTION

1. The campus of a public university is known as a "marketplace of ideas." That marketplace depends on free expression by students.

2. This case arises from policies and practices of North Carolina State University (the "University") and public officials employed by the University that restrict the expressive rights of students.

3. The University's Solicitation Policy (the "Speech Permit Policy"), which regulates expressive activity on campus, requires students to obtain the prior permission of the University before they engage in any expressive activity anywhere on campus, including distribution of any written material or even oral communication to other students.

4. The Policy also grants University officials unbridled discretion to restrict the content and viewpoint of student speech if it is not "consistent with the University's mission and purpose of the location."

5. Plaintiff Grace Christian Life ("Grace") is a registered student organization at the University whose goal is to give an accurate picture of Jesus and His church to all people everywhere.

6. In furtherance of its goal, student members and staff of Grace regularly initiate conversations with students about religion and other important topics. These conversations take place in the public areas of campus where students congregate such as inside and outside of the Talley Student Union.

7. On September 15, 2015, Grace was informed by the University that it was not allowed to approach students for the purpose of engaging in religious conversations without first obtaining prior written permission of the University.

8. This action is premised on the United States Constitution concerning the denial of Plaintiff's fundamental rights to freedom of speech, freedom of religion, due process, and equal protection of law.

9. The aforementioned policy and practices are challenged on their face and as applied to Grace.

10. Defendants' policy and practices have deprived and will continue to deprive Grace of its paramount rights and guarantees under the United States Constitution.

11. Each and every act of Defendants alleged herein was committed under the color of state law as each Defendant exercised power possessed by virtue of state law and each act was made possible only because the Defendant was clothed with the authority of state law.

## JURISDICTION AND VENUE

12. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

2

13. This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

14. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys fees under 42 U.S.C. § 1988.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and/or all of the acts described in this Complaint occurred in this district.

## PLAINTIFF

16. Plaintiff Grace Christian Life is an unincorporated, expressive student organization at the University.

17. Grace has been registered as a recognized student organization at the University for more than 20 years.

18. The mission of Grace is to give an accurate picture of Jesus and His church to all people everywhere. Grace seeks to accomplish its mission through Bible studies, weekend worship services, small groups, one-on-one discussions, and other activities.

19. Grace expresses its religious message on the University's campus through a variety of means including flyers, signs, hosting tables with information, worship services, small group meetings, and talking with fellow students about religious ideas, just to name a few.

20. When engaged in these expressive activities, Grace discusses religious, social, cultural, and moral issues, events, and ideas.

21. Grace brings this suit on behalf of itself as a recognized student organization at the University and on behalf of its individual student members.

3

## DEFENDANTS

22. Defendant W. Randolph Woodson is, and was at all times relevant to this Complaint, the Chancellor of North Carolina State University, a public university organized and existing under the laws of the State of North Carolina.

23. The Board of Governors of the University of North Carolina governs the University.

24. The Board of Governors has delegated to the Chancellor of the University powers to exercise discretionary authority and to perform duties vested in the Board of Governors related to the operation, control and management of the University.

25. Defendant Woodson is the chief educational and administrative officer of the University.

26. The Board of Governors delegates to Defendant Woodson the responsibility for final policymaking authority concerning student free speech activities at the University.

27. University policy vests Defendant Woodson with the final authority to adopt, amend, or suspend University policies.

28. Defendant Woodson has the authority to delegate authority among subordinates.

29. Defendant Woodson is responsible for enactment and enforcement of University policies, including the Speech Permit Policy challenged herein, and their application to Grace's speech.

30. Defendant Woodson possesses the authority and responsibility for regulation of expression by students, employees, and third parties on campus.

31. All changes in campus policy concerning student and public expression are made only with the prior approval of Defendant Woodson.

32. Defendant Woodson has not changed, nor instructed the Defendants to change the Speech Permit Policy to comply with constitutional mandates.

33. Defendant Woodson is sued in his official capacity for injunctive and declaratory relief and his individual capacity for damages resulting from the Speech Permit Policy.

4

34. Defendant Warwick A. Arden is, and was at all times relevant to this Complaint, the Provost and Executive Vice Chancellor at North Carolina State University, a public university organized and existing under the laws of the State of North Carolina.

35. Defendant Arden, in consultation with Defendant Woodson, is responsible for enforcement of the Speech Permit Policy and its application to Grace's speech.

36. Defendant Arden possesses the authority and responsibility for regulation of campus expression by students.

37. All changes in campus policy concerning student expression are made only with the prior approval of Defendants Woodson and Arden.

38. Defendant Arden has not changed, nor instructed the Defendants to change or alter the Speech Permit Policy to comply with constitutional mandates.

39. Defendant Arden has authority under the Speech Permit Policy to review, approve, modify, or reject requests by students to use campus facilities and grounds.

40. Defendant Arden is sued in his official capacity for injunctive and declaratory relief and his individual capacity for damages resulting from the Speech Permit Policy.

41. Defendant Mike Giancola is, and was at all times relevant to this Complaint, Associate Vice Provost at North Carolina State University, a public university organized and existing under the laws of the State of North Carolina.

42. Defendant Giancola is responsible for interpreting and enforcing policies that regulate students at the University as delegated to him by Defendant Arden, including the Speech Permit Policy challenged herein that was applied to Grace.

43. Defendant Giancola enforced the Speech Permit Policy against Grace and participated in the decision that Grace could not approach students for the purpose of engaging in religious conversations without first obtaining prior written permission of the University.

44. Defendant Giancola is sued in his official capacity for injunctive and declaratory relief and his individual capacity for damages resulting from the Speech Permit Policy.

5

45. Defendant TJ Willis is, and was at all times relevant to this Complaint, Associate Director of University Student Centers at North Carolina State University, a public university organized and existing under the laws of the State of North Carolina.

46. Defendant Willis is responsible for interpreting and enforcing policies that regulate students at the University as delegated to him by Defendant Arden, including the Speech Permit Policy challenged herein that was applied to Grace.

47. One of Defendant Willis's responsibilities is to review and give final approval or disapproval to requests by students to engage in expressive activities inside of University facilities.

48. In executing his duty to review student speech requests and regulate student speech, Defendant Willis implements the University's Speech Permit Policy.

49. Defendant Willis enforced the Speech Permit Policy against Grace and participated in the decision that Grace could not approach students for the purpose of engaging in religious conversations without first obtaining prior written permission of the University.

50. Defendant Willis is sued in his official capacity for injunctive and declaratory relief and his individual capacity for damages resulting from the Speech Permit Policy.

## FACTUAL BACKGROUND

51. North Carolina State University is a public university organized and existing under the laws of the State of North Carolina, and receives funding from the State of North Carolina to operate.

52. The University's campus is composed of various publicly-accessible buildings and outdoor areas, including public streets, sidewalks, open-air quadrangles, and parks. A copy of the University's campus map is attached as Exhibit 1 to this Complaint.

53. The outdoor areas of the University's campus are open to the public and there are no gates or barriers to pedestrian entry.

54. The campus is maintained like a park with large cultivated grass areas, trees, benches, and sidewalks.

6

55. The University's campus is approximately 2,090 acres, which is approximately 91,040,400 square feet of land.

56. The University's campus has many suitable streets, sidewalks, open-air quadrangles, parks, and open spaces where expressive activity will not interfere with or disturb the University's educational environment or access to buildings and sidewalks.

57. In 2015, the University completed the renovation of the Talley Student Union. The University designed the new Student Union to be a "new campus hub." On September 8, 2015, the University published an article on its website describing the purpose of the Student Union:

> More than 10,000 people pass through Talley each day, stopping to eat at one of eight restaurants and cafes, conferring with fellow students in meeting and lounging spaces, catching a performance at Stewart Theatre or working with one of the student engagement and diversity offices housed there.

A copy of the article is attached hereto as Exhibit 2 to this Complaint.

58. The University recognizes that organized student groups are a valuable part of the student educational environment, because they further the University's educational mission.

59. More than 600 student organizations are recognized by the University each year.

60. Student organizations provide opportunities for learning outside the classroom, for meeting other people with similar interests, for developing life, work and leadership skills, for gaining a broader experience and a greater perspective, and for engaging students as citizens of the campus community.

61. All recognized student organizations must adhere to the University's policies and procedures.

**The Speech Permit Policy**

62. The University regulates student oral, written, and graphic speech through University Regulation 07.25.12, titled: Solicitation (the "Speech Permit Policy"). A copy of the Speech Permit Policy is attached as Exhibit 3 to this Complaint.

7

63.    The Speech Permit Policy identifies Defendant Arden as the University employee responsible for administration and implementation of the policy.

64.    The Speech Permit Policy defines "Commercial Solicitation" as "any proposal to sell, seeking or asking of an offer to buy, dissemination of information for the purpose of facilitating the sale of goods or services, any activity which attempts to raise funds, whether through the sale of goods and services or donations, for any entity that is not a charitable organization, or the dissemination or collection of surveys for a commercial purpose." Ex. 3 at 2.3.

65.    The Speech Permit Policy defines "Non-Commercial Solicitation" as "any distribution of leaflets, brochures, or other written material, or oral speech to a passersby *[sic]*, conducted without the intent to obtain commercial or private pecuniary gain" but does not include "the dissemination of information for purposes of the administrative, academic, research, or extension activities of the University." Ex. 3 at 2.4.

66.    The Speech Permit Policy provides that any person "wishing to conduct any form of solicitation on University premises must have the written permission of the Student Involvement in advance." Further, depending on the location of the proposed activity, the permission of the administrator responsible for the facility or location where the activity is to be held may also be necessary. Ex. 3 at 3.1.

67.    Specifically, if a student or student group wishes to engage in speech – Noncommercial Solicitation – anywhere on the University campus (other than University housing), the student or student group (1) must obtain prior approval of Student Involvement; and (2) "if applicable, by the administrator responsible for the facility or location where the activity is to be held." Ex. 3 at 5.2.2.

68.    If the student or student group desires to speak at a University facility, the student or student group must also obtain permission from the administrator responsible for scheduling use of the facility and must sign a Facility Use Agreement. Ex. 3 at 5.2.4. A copy of the Facility Use Agreement is attached as Exhibit 4 to this Complaint.

8

69. Pursuant to the Speech Permit Policy, a student or student group must obtain the prior written permission of Student Involvement before they engage in any oral speech or distribute any written material to any person anywhere on the University campus.

70. The Speech Permit Policy provides that permission to speak "may be limited to solicitation that is consistent with the University's mission and purpose of the location." Ex. 3 at 3.3.

71. The Speech Permit Policy contains no objective criteria for University officials and the Defendants to use when determining what speech "is consistent with the University's mission and purpose of the location."

72. The Provost and Executive Vice Chancellor, Defendant Arden, possesses the authority to evaluate whether student speech is consistent with the University's mission and purpose of the location, and to disallow or place restrictions on the dissemination of that speech based on content and viewpoint if he deems it necessary.

73. Defendant Willis, as Associate Director of University Student Centers, possesses the authority to evaluate whether a student's application to speak inside of a University building is consistent with the University's mission and purpose of the location, and to disallow or place restrictions on the dissemination of that speech based on content and viewpoint if he deems it necessary.

74. The Speech Permit Policy authorizes Defendants Arden and Willis or their designees to examine the content or viewpoint of expression and censor that expression if they subjectively determine that the speech is not consistent with the University's mission or purpose of the location.

75. The Speech Permit Policy, which allows the Provost and Executive Vice Chancellor or his designee to grant or deny to students permission to speak on campus, contains no guidelines or standards to limit the discretion of the administrator enforcing the policy.

9

76. The Speech Permit Policy contains no deadline by which NC State administrators must decide whether to grant or deny a student's request to speak on campus, meaning the student's request for a speech permit could remain pending indefinitely.

77. The penalties for students and groups that speak without a speech permit can be severe. Section 5.2 addresses when "non-commercial solicitation" is allowed in "areas other than university housing." The provision reaffirms that all written or oral expression "must be approved in advance by Student Involvement, and, if applicable, by the administrator responsible for the facility or location where the activity is to be held." Ex. 3 at 5.2.2.

78. The provision also sets forth additional requirements that apply to the distribution of "printed materials," and expressly states that "Violations may result in a trespass order pursuant to NCSU REG 04.05.01—Trespassing on University Property and N.C.G.S. 14-159.13 or other applicable statute." Ex. 3 at 5.2.3(d). That statute—N.C. Gen. Stat. § 14-159.13— defines the criminal act of second degree trespass, a Class 3 misdemeanor under North Carolina law.

79. Thus, a student handing out printed material almost anywhere on campus without school permission could be convicted of a crime "if, without authorization, he enters or remains on premises of another … [a]fter he has been notified not to enter or remain there by the owner, by a person in charge of the premises, by a lawful occupant, or by another authorized person." N.C. Gen. Stat. § 14-159.13(a)(1).

80. Even if a student who speaks without a permit is not subject to criminal prosecution, he or she may still face University disciplinary proceedings. NC State's Code of Student Conduct provides that "any "[v]iolation of any written policies, regulations, or rules of the University" is "non-academic misconduct" "that will be subject to disciplinary action." NC State Policy 11.35.01 § 10.20. A copy of the NC State Code of Student Conduct is attached as Exhibit 5 to this Complaint. These sanctions range from a written warning to suspension to even expulsion from NC State. *See* Ex. 5 at 11.1-11.4.

10

81.     NC State also reserves the right to impose sanctions on student groups and organizations that distribute written materials or talk to other students without a permit.  These "[a]dditional group or organizational sanctions may include revocation or denial of registration or recognition."  Ex. 5 at 11.7.

82.     Moreover, a student group or organization's "officers may be held collectively or individually responsible for violations of the Code."  Ex. 5 at 5.4.1.  NC State can require a group or organization's officers or leaders "to take appropriate action designed to address the violation of the Code or to prevent its recurrence by the student group/organization."  Ex. 5 at 5.4.3.  "Failure to comply … shall be considered a violation of the Code, both by the officers, leaders, or representative for the student group/organization and by the student group/organization itself," *id*., which can subject both students and the group to punishment.

## Grace's Expressive Activities

83.     As part of the regular activities of Grace, student members and staff of Grace engage in religious discussions with students at various locations on the University campus.

84.     These religious discussions at times involve the distribution of written material, such as business cards, invitations to Grace events, religious tracts, or other handwritten notes prepared during the discussion providing further detail about becoming a follower of Jesus Christ.

## Defendants' Violation of Grace's Freedom of Speech

85.     In September 2015, Todd Valentine, a student member of Grace, and Thommy Saunders, a staff member of Grace that was permitted by the University to be on campus, went to the Talley Student Union to engage with students in religious discussions and invite them to attend Grace worship services and other Grace events.

86.     Defendant Willis observed Valentine and Saunders engaging in religious discussions with students.

87.    Defendant Willis instructed Valentine and Saunders that they were not allowed to approach students for purposes of engaging in religious discussions because that was a violation of the Speech Permit Policy.

88.    Pursuant to Defendant Willis's order, Valentine and Saunders stopped engaging in religious discussions with students.

89.    On September 11, 2015, Defendant Willis sent the following e-mail to Defendant Giancola:

Mike,

Wanted to check-in with you on an observation I have seen in the building on multiple occasions. There is an individual named Tommy who works with Grace who is essentially soliciting throughout the building. He walks up to a single person or duo of persons, starts with a hello and then starts the conversation into religion, ending with giving them a card. This would fall under the university PRR of solicitation (Noncommercial).

This is different than the many other religious (and non-religious) groups we have to reserve a lobby table, host a bible study in a location or have people meet them in a specific location.

We have been enforcing the PRR and have stopped groups of all kinds (commercial, religious, etc) from passing out info in and around the facility which helps to create that inclusive, welcoming environment.

A copy of the e-mail is attached as Exhibit 6 to this Complaint.

90.    On September 13, 2015, Defendant Giancola forwarded the e-mail to Ann Pearce, Director of the recently-dissolved Chaplains' Cooperative Ministry ("CCM"), and several other University employees.  Defendant Giancola did not include any text in his e-mail.  Ex. 6.

91.    On September 15, 2015, Ann Pearce sent the following e-mail to Saunders and forwarded a copy of Defendant Willis' e-mail:

Here is recent email regarding improper solicitation that Has *[sic]* been observed in Talley recently. I think you will understand once you read it that Dr. Willis has observed Tommy's disregarding the University's policy on undue solicitation in Talley Student Union.

12

Tommy, perhaps you have not been aware that this type of solicitation is not allowed. I'll be glad to discuss this with all 3 of you sometime when it is convenient. I'm in Pensacola this week, but am available via phone 919-696-1691. Or.....you may call Mike Giancola for further clarification if you'd like.

I look forward to seeing all of you on the 22nd at our beginning of the new semester breakfast meeting.

Ex. 6.

92.     CCM was an independent, interfaith organization that supported individual campus ministries and planned jointly sponsored interfaith programs for students, faculty and staff.   Religious student organizations had the option to become a member of CCM and participate in its activities.   One of the benefits of becoming a member of CCM was that non-student ministry leaders of the student organization were issued University identification cards, University e-mail accounts, and parking passes, which allowed these ministry leaders access to campus facilities that are typically reserved for students and employees of the University.

93.     Grace was a member of CCM.  During 2015, Grace's authorized representatives with CCM were Ed Russ, Ross Thomas, Thommy Saunders, and Berk Wilson.

94.     On October 6, 2015, Mike Giancola attended a CCM membership meeting to advise CCM members on the speech restrictions imposed by the Speech Permit Policy.  The Minutes of the CCM meeting reflect that Mike gave the following instructions:

> The University has a PRR (Policy, Regulation, or Rule) related to solicitation. Mike sited [*sic*] violations in Talley as reported by Dr. T.J. Willis involving an intern from Grace.  Solicitation is not allowed when conversation is initiated under one pretense different from the intended purpose……inviting involvement in a certain ministry.  The appropriate way to issue such an invitation is for a group to work through RAVE to reserve a space or table for a given time period. The University guidelines that Mike will forward to Ann (who will then forward to everyone) are viewpoint neutral.

95.     In November 2015, Grace received an e-mail stating that the University was dissolving its relationship with CCM because "the current environment of diversity and faith traditions within the university is not shown or mirrored well within CCM as it currently exists." As a result of the University's decision, CCM members were told that they would no longer

13

receive University-issued identification cards and could not rent the CCM office. Shortly thereafter, CCM members voted to dissolve CCM.

96. On December 2, 2015, counsel for Plaintiff sent a letter to Eileen Goldgeier, General Counsel for the University, informing her that the Speech Permit Policy was unconstitutional and requesting that the University revise the Speech Permit Policy. A copy of the letter is attached as Exhibit 7 to the Complaint.

97. On December 8, 2015, Shawn Troxler, Assistant General Counsel for the University, sent a letter to Plaintiff's counsel. Mr. Troxler's letter states that the prohibition on Noncommercial Solicitation in the Speech Permit Policy was properly applied to Grace and that the Speech Permit Policy's restriction on speech did not violate the First Amendment rights of Grace and its members. A copy of the letter is attached as Exhibit 8 to the Complaint.

98. On January 6, 2016, counsel for Plaintiff sent an e-mail to Mr. Troxler inquiring whether the Speech Permit Policy requires a student to obtain a permit from the University any time a student desires to hand out written material to other students.

99. On January 19, 2016, Mr. Troxler confirmed that "if a student desires to hand out such material he or she should obtain a permit from the university's Student Involvement Office." A copy of the e-mail is attached as Exhibit 9 to the Complaint.

**Defendants Apply the Speech Permit Policy in a Viewpoint Discriminatory Manner**

100. On January 27, 2016, Grace set up a table in Talley Student Union with the prior permission of the University.

101. At the time the permit was obtained, an employee of the Student Involvement Office informed Grace members that they were not required to stay behind the table, but that they were allowed to walk around and engage in conversations with students.

102. Pursuant to these instructions, Grace members set up the table and began walking around engaging in conversations with students.

103. Shortly after setting up the table, Grace members were approached by an employee of the Student Involvement Office, and informed that they were not allowed to leave

the table and engage in conversations with students, but that they were required to remain behind the table and allow students to come to the table to engage in conversations.

104. The University has not restricted the ability of other students and student groups to engage in expressive activity.

105. Grace has witnessed other students, student groups, and off-campus groups handing out literature either without a permit or outside of the area reserved by their table permit.

106. On January 27, 2016, a staff member of Grace witnessed an individual inside the Talley Student Union handing out political flyers. The Grace staff member approached the individual and inquired whether he had obtained a permit from the University. The individual stated "it's Talley; you don't need a permit to talk to people." A copy of the flyer is attached as Exhibit 10 to the Complaint.

107. On February 3, 2016, a staff member of Grace encountered a representative of Red Cross in the Talley Student Union passing out flyers in front of the bookstore. Although Red Cross had a table set up in Talley Student Union, the table was not in front of the bookstore, but was in a different location.

108. On February 8, 2016, a student member of Grace witnessed two men talking with students outside the tunnel between Talley Student Union and Riddick Hall. The two men indicated that they were with www.workforstudentsnow.com and were engaging students and writing down names and e-mails of students that may be interested in jobs and internships. The Grace member approached the men and inquired whether they had obtained a permit. The men stated that they had not obtained a permit and were not aware that a permit was required.

109. On March 24, 2016, a student representative of NCPIRG, a student organization, approached a student member of Grace on the third floor of the Talley Student Union and requested that she sign a petition. The Grace member inquired whether he was required to have a permit to obtain signatures for a petition in Talley. The NCPIRG representative said that he did not believe a permit was required "unless you are trying to sell something."

15

110. On March 30, 2016, Grace set up a table in Talley Student Union with the prior permission of NC State. Shortly after setting up the table, Thommy Saunders, a staff member of Grace, witnessed a representative of College Point Church, a student group that had also set up a table, leave his table and begin passing out written material to students throughout the room. Defendant Willis walked by the College Point Church representative on at least four occasions but did not stop him from passing out such written material.

111. On that same day, about an hour later, Saunders was in front of the Grace table when he was approached by an NC State employee. The employee informed Saunders that under the Speech Permit Policy Grace was not allowed to call across the room to passing students or to leave the table to engage in conversations with students that did not first approach the Grace table. A picture of the incident is attached as Exhibit 11 to the Complaint.

112. Later that day, a student member of Grace was sitting at the Grace table when she was approached by a representative from a table across the room. The representative handed her a couple of flyers advertising Financial Literacy Month. The representative then walked to the lobby area and began handing out pamphlets to passing students. Another representative from the same table went to the area near Port City Java in Talley and handed out a pamphlet to three consecutive tables of students. Defendant Willis was sitting on a couch in clear view of these representatives passing out written material but he did not take any action to stop them from passing out material. Pictures of the incident are attached as Exhibit 12 to the Complaint.

113. Grace wants to engage in conversations with other students and hand out literature, both inside and outside of Talley Student Union, without obtaining the prior permission of the University.

114. Grace wants to distribute literature outside of its reserved speech zone in the Talley Student Union to reach a larger audience.

115. Grace has at times refrained from distributing literature outside of its reserved speech zone for fear of punishment by the University.

16

116. The University has not restricted the ability of other student groups and off-campus groups to distribute materials without a permit or outside of their reserved speech zones.

**The Effect of Defendants' Speech Permit Policy on Grace's Speech**

117. Grace desires to engage in religious expression on campus—including oral communication and literature distribution—without obtaining prior permission of the University, but has frequently refrained from doing so for fear of punishment.

118. The University's enforcement of the Speech Permit Policy against Grace burdens its speech in multiple ways.

119. Grace wants to engage in speech containing religious messages inside Talley Student Union and in open areas on campus without obtaining prior permission of the University.

120. The Speech Permit Policy does not provide a means for students to speak spontaneously on campus.

121. The Speech Permit Policy does not provide any objective criteria for Defendants to use when deciding whether to approve or reject a student's request to speak on campus.

122. The Speech Permit Policy does not limit the discretion of Defendants when deciding whether to approve or reject a student's request to speak on campus.

123. Students or student organizations that violate the Speech Permit Policy will be subject to disciplinary action under University policies and possibly state criminal trespass laws.

124. Grace is not engaging in certain oral and written speech on religious topics with other students on campus due to the Speech Permit Policy.

125. Grace is chilled in its ability to discuss religious topics on campus due to the Speech Permit Policy.

126. If not for the Speech Permit Policy, Grace would immediately engage in religious discussions with other students on campus.

127. Grace refrains from doing so for fear of punishment under the University's Speech Permit Policy and state criminal trespass laws.

128. The fear of punishment severely limits Grace's constitutionally-protected expression on campus.

129. Defendants have also applied the Speech Permit Policy in a viewpoint discriminatory manner because they have allowed other students, student groups, and off-campus groups to engage in non-religious conversations with other students without obtaining prior permission of the University as required by the Speech Permit Policy.

## ALLEGATIONS OF LAW

130. At all times relevant to this Complaint, each and all of the acts alleged herein were attributed to the Defendants who acted under color of a statute, regulation, custom, or usage of the State of North Carolina.

131. Defendants knew or should have known that by requiring Grace to obtain permission prior to engaging in religious discussions with other students on campus, the University violated Grace's constitutional rights.

132. Grace is suffering irreparable harm from the policy and practice of Defendants.

133. Grace has no adequate or speedy remedy at law to correct or redress the deprivation of its rights by Defendants.

134. Unless the conduct of Defendants is enjoined, Grace will continue to suffer irreparable injury.

## FIRST CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### Prior Restraint and Content and Viewpoint Discrimination

135. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–130 of this Complaint.

136. Speech is entitled to comprehensive protection under the First Amendment.

137. Religious speech is fully protected by the First Amendment.

138. The First Amendment also protects citizens' right to engage in spontaneous and anonymous speech.

18

139. The First Amendment rights of free speech and press extend to campuses of state colleges.

140. The sidewalks and open spaces of the University's campus are traditional or designated public forums for speech and expressive activities by students enrolled at the University.

141. The University has also opened certain buildings to be designated public forums, including the Talley Student Union.

142. The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits content and viewpoint discrimination in the public forums for student speech and expression on the campus of a public college.

143. A public university's ability to restrict speech—particularly student speech—in a public forum is limited.

144. Under the First Amendment's Free Speech Clause, a prior restraint on citizens' expression is presumptively unconstitutional, unless it (1) does not delegate overly broad licensing discretion to a government official, (2) contains only content and viewpoint neutral reasonable time, place, and manner restrictions, (3) is narrowly tailored to serve a significant governmental interest, and (4) leaves open ample alternative means for communication.

145. Defendants' Speech Permit Policy and their practice of forbidding students and student organizations from engaging in expressive activities without express written consent violates the First Amendment facially and as applied because it prohibits students and student organizations from engaging in speech in public areas of the campus without prior permission.

146. Defendants' Speech Permit Policy and their practice of requiring students and student organizations to obtain written consent in order to engage in speech at the University violates the First Amendment facially and as applied because it prohibits students and student organizations from engaging in anonymous or spontaneous expression.

147. Defendants' Speech Permit Policy and their practice of requiring students and

19

student organizations to obtain express written consent in order to engage in speech at the University violates the First Amendment facially and as applied because it is a prior restraint on speech in areas of campus that are traditional or designated public forums for University students.

148. Defendants' Speech Permit Policy and their practice of requiring students and student organizations to obtain express written consent in order to engage in speech at the University violates the First Amendment facially because it contains no timeframe in which the University administrators must rule on a student's request for permission to speak. The Policy's failure to ensure a prompt decision creates the risk that NC State will delay a permit request indefinitely.

149. Defendants' Speech Permit Policy and associated practices are an unconstitutional "time," "place," and "manner" restriction that violates Grace's and other students' right to freedom of speech and expression.

150. Defendants' Speech Permit Policy and associated practice are neither reasonable nor valid time, place, and manner restrictions on speech because they are not content-neutral, they are not narrowly tailored to serve a significant government interest, and they do not leave open ample alternative channels of communication.

151. While Defendants have an interest in maintaining a safe campus, requiring advance approval in order to engage in speech in public areas of the University campus is not narrowly tailored to Defendants' interest.

152. The overbreadth of Defendants' Speech Permit Policy and related practice chill the speech of students not before the Court who seek to engage in private expression on campus.

153. Defendants violated Grace's First Amendment right to freedom of speech by ordering its members to stop engaging in speech activities and telling them that they would not be allowed to engage in any such speech activities on campus without first obtaining Defendants' written consent.

20

154. Defendants' Speech Permit Policy and associated practices grant University administrators unbridled discretion to regulate speech based on content or viewpoint and are not narrowly tailored to a compelling state interest.

155. By granting unbridled discretion to discriminate against speech based on its content or viewpoint, the Speech Permit Policy violates the First Amendment regardless of whether that discretion has ever been unconstitutionally applied in practice.

156. Defendants regulated Plaintiff's speech based on its religious content and viewpoint when it required Plaintiff to obtain prior permission to speak while allowing speakers with other viewpoints to speak without prior permission.

157. Defendants regulated Plaintiff's speech based on its religious content and viewpoint when it required Plaintiff to remain behind its table in Talley Student Union while allowing speakers with other viewpoints to leave the table and engage with students in other parts of the building.

158. Defendants Willis and Giancola exercised the unbridled discretion granted them under the Speech Permit Policy when they informed Plaintiff that it was required to obtain a permit prior to engaging in religious discussions with other students in Talley Student Union.

159. Defendants' Speech Permit Policy provides no guidelines or standards to limit the discretion of University officials in deciding when or whether to grant or deny a student's request to speak.

160. Defendants' Speech Permit Policy requires Defendants to examine students' speech to determine whether such speech is consistent with the University's mission and purpose of the location.

161. Defendants' Speech Permit Policy and associated practices give Defendants unbridled discretionary power to limit student speech in advance of such expression on campus and to do so based on the content and viewpoint of the speech.

162. These grants of unbridled discretion to University officials violate the First Amendment because they create a system in which speech is reviewed without any standards,

thus giving students no way to prove that a denial, restriction, or relocation of their speech was based on unconstitutional considerations.

163. The First Amendment's prohibition against content and viewpoint discrimination requires Defendants to provide adequate safeguards to protect against the improper exclusion, restriction, or relocation of student speech based on its content or viewpoint.

164. Because Defendants have failed to establish neutral criteria governing the decision whether to allow students to speak, there is a substantial risk that University officials will engage in content and viewpoint discrimination when addressing student speech.

165. Defendants' Speech Permit Policy and associated practices are content- and viewpoint-based regulations of speech in traditional or designated public fora.

166. Defendants' Speech Permit Policy and associated practices restrict student speech based on whether Defendants believe that the speech is consistent with the University's mission or purpose of the location, which requires the Defendants to evaluate the content and viewpoint of the speech.

167. Defendants regularly permit students, student organizations, and off-campus organizations to distribute flyers in Talley Student Union and the open spaces of the campus without obtaining prior permission.

168. Defendants' Speech Permit Policy and associated practices chill, deter, and restrict Grace and its student members from freely expressing their religious beliefs.

169. Defendants' Speech Permit Policy and associated practices violate Grace's right to free speech as guaranteed by the First Amendment to the United States Constitution.

170. Because of Defendants' actions, Grace has suffered, and continues to suffer, economic injury and irreparable harm. Grace is entitled to an award of monetary damages and equitable relief.

171. Pursuant to 42 U.S.C. §§ 1983 and 1988, Grace is entitled to a declaration that Defendants violated its First Amendment right to freedom of speech and an injunction against Defendants' Speech Permit Policy and actions. Additionally, Grace is entitled to damages in an

22

amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including its reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
### Violation of Plaintiff's Fourteenth Amendment Right to Due Process of Law

172. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–130 of this Complaint.

173. The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the right to due process of law and prohibits Defendants from promulgating and employing vague standards that allow for content or viewpoint discrimination in Defendants' handling of Plaintiff's speech.

174. The government may not regulate speech based on policies that permit arbitrary, discriminatory, and overzealous enforcement.

175. The government may not regulate speech based on policies that cause persons of common intelligence to guess at their meaning and differ as to their application.

176. Defendants' Speech Permit Policy and associated practices contain no criteria to guide administrators when deciding whether speech is consistent with the University's mission and purpose of the location.

177. Defendants' Speech Permit Policy and associated practices are impermissibly vague and ambiguous and are thus incapable of providing meaningful guidance to Defendants.

178. The lack of criteria, factors, or standards in Defendants' Speech Permit Policy and practices renders the policy and practice unconstitutionally vague, facially and as applied, in violation of Plaintiff's right to due process of law under the Fourteenth Amendment.

179. Because of Defendants' actions, Plaintiff has suffered, and continues to suffer irreparable harm. It is entitled to an award of monetary damages and equitable relief.

180. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a declaration that Defendants violated its Fourteenth Amendment right to due process of law and an injunction against Defendants' policy and actions. Additionally, Plaintiff is entitled to damages in an

amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including its reasonable attorneys' fees.

## THIRD CAUSE OF ACTION
### Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection of the Law

181. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–130 of this Complaint.

182. The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the equal protection of the laws, which prohibit Defendants from treating Plaintiff differently than similarly situated students and student organizations.

183. The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

184. Plaintiff is similarly situated to other students and student organizations at the University.

185. Defendants allow other students and student organizations to speak without prior permission, but prohibit Plaintiff from speaking unless it has prior permission.

186. Defendants allow other students and student organizations to distribute literature and engage in conversations with students outside their reserved speech zones, but prohibit Plaintiff from doing the same.

187. Defendants' Speech Permit Policy and practices violate various fundamental rights of Plaintiff, such as its freedom of speech and due process of law.

188. When government regulations, like Defendants' Speech Permit Policy and associated practices challenged herein, infringe on fundamental rights, discriminatory intent is presumed.

189. Defendants' Speech Permit Policy and associated practices have also been applied to discriminate intentionally against Plaintiff's rights to freedom of speech and due process of law.

24

190. Defendants lack a rational or compelling state interest for such disparate treatment of Plaintiff.

191. Defendants' Speech Permit Policy and associated practices are not narrowly tailored as applied to Plaintiff because Plaintiff's speech does not implicate any legitimate state interest.

192. Defendants have applied the Speech Permit Policy and practices to Plaintiff in a discriminatory and unequal manner, allowing other student organizations to speak freely and distribute literature when Defendants say Plaintiff cannot do the same, in violation of Plaintiff's right to equal protection of the laws under the Fourteenth Amendment.

193. The disparate treatment of Plaintiff compared to similarly situated student organizations based on Defendants' Speech Permit Policy and practices renders the policy and practice unconstitutional, facially and as applied, in violation of Plaintiff's right to equal protection of the laws under the Fourteenth Amendment.

194. Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm. It is entitled to an award of monetary damages and equitable relief.

195. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a declaration that Defendants violated its Fourteenth Amendment right to equal protection of law and an injunction against Defendants' policy and actions. Additionally, Plaintiff is entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including its reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Free Exercise of Religion
### (42 U.S.C. § 1983)

196. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–130 of this Complaint.

25

197. The First Amendment's Free Exercise of Religion Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits the government from burdening religious exercise through non-neutral and non-generally applicable laws, unless it can demonstrate a compelling interest for doing so.

198. Grace desires to engage in the expressive activities described above on the basis of its sincerely held religious beliefs.

199. Defendants' Speech Permit Policy and practice substantially burdens Grace's free exercise of religion by prohibiting Grace from sharing its religious views anywhere on campus without first obtaining permission from Defendants, but allowing other people to share their non-religious views without obtaining prior permission.

200. Defendants' Speech Permit Policy and practice are not neutral or generally applicable as they deny Grace the ability to express a religious message, while at the same time providing other persons the ability to discuss matters from a nonreligious point of view.

201. Defendants' Speech Permit Policy and practice are not neutral because they target some religious speech but not other religious speech and permit Defendants to arbitrarily decide what speech is permitted under the policy and practice and what speech is not.

202. Defendants' Speech Permit Policy and practice are likewise not generally applicable because they grant Defendants unbridled discretion to censor Grace's religious expression while permitting other persons to engage in religious and non-religious expression on the campus.

203. Defendants' Speech Permit Policy and practice constitute the imposition of special disabilities on Grace due to its religion and its intent to engage in religious expression.

204. These special disabilities apply only to religious speech and exercise and to no other speech.

205. Defendants' Speech Permit Policy and practice cannot be justified by a compelling governmental interest and are not narrowly tailored to advance any such interest.

206. Defendants' Speech Permit Policy and practice chills Grace's freedom of religious exercise, which is a fundamental right guaranteed to it by the First Amendment.

207. Defendants' Speech Permit Policy and practice of prohibiting Grace and others from engaging in religious expression on campus violates the Free Exercise Clause of the First Amendment to the United States Constitution, as incorporated and applied to Defendants under the Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and provide Plaintiff with the following relief:

(A) A declaratory judgment that Defendants' Speech Permit Policy and associated practices, facially and as-applied, violate Plaintiff's rights under the First Amendment;

(B) A declaratory judgment that Defendants' Speech Permit Policy and associated practices, facially and as-applied, violate Plaintiff's rights under the Fourteenth Amendment;

(C) A declaratory judgment that Defendants' restriction of Plaintiff's religious speech, violated Plaintiff's rights under the First and Fourteenth Amendments;

(D) A preliminary and permanent injunction prohibiting Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the Speech Permit Policy and associated practices challenged in this Complaint;

27

(E) Compensatory and nominal damages in the amount of $100.00 for the violation of Plaintiff's First and Fourteenth Amendment rights;

(F) Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

(G) All other further relief to which Plaintiff may be entitled.

Respectfully submitted this 26th day of April, 2016,

By: /s/ Edmund G. LaCour Jr.

EDMUND G. LACOUR JR.
District of Columbia Bar No. 1030165
**BANCROFT PLLC**
500 New Jersey Avenue, 7th Floor
Washington D.C. 20001
202-234-0090
202-234-2806 FAX
elacour@bancroftpllc.com

DAVID A. CORTMAN
Georgia Bar No. 188810
TRAVIS C. BARHAM
Georgia Bar No. 753251
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
dcortman@adflegal.org
tbarham@adflegal.org

DAVID J. HACKER
California Bar No. 249272
**ALLIANCE DEFENDING FREEDOM**
101 Parkshore Drive, Suite 100
Folsom, California 95630
(916) 932-2850
(916) 932-2851 Fax
dhacker@adflegal.org

28

TYSON C. LANGHOFER
Arizona Bar No. 032589
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th St.
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
tlanghofer@adflegal.org

CHRISTIAN E. DYSART
Bar No. 36734
**DYSART LAW**
507 N. Blount St.
Raleigh, North Carolina 27604
(919) 747-8380
(919) 882-1222
Christian@cedysart.com
Local Civil Rule 83.1 Counsel for Plaintiff

ATTORNEYS FOR PLAINTIFF

29

## DECLARATION UNDER PENALTY OF PERJURY

I, HANNALEE ALRUTZ, a citizen of the United States and a resident of the State of North Carolina, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 22 day of April, 2016, at Raleigh , North Carolina.


_Hannalee Alrutz_
HANNALEE ALRUTZ, PRESIDENT
GRACE CHRISTIAN LIFE

30