# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | | |
|---|---|---|
| **GRACE CHRISTIAN LIFE**, a registered student organization at North Carolina State University, | ) ) ) ) ) ) ) | |
| *Plaintiff*, | ) | |
| v. | ) ) | Case No. 5:16-cv-00202 |
| **WILLIAM R. WOODSON**, Chancellor of North Carolina State University, in his official and individual capacities; **WARWICK A. ARDEN**, Provost and Executive Vice Chancellor, in his official and individual capacities; **TJ WILLIS**, Associate Director of University Student Centers, in his official and individual capacities; **MIKE GIANCOLA**, Associate Provost, in his official and individual capacities, | ) ) ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 2

      A.      North Carolina State University's campus and Student Union .............................. 2

      B.      NC State's Speech Permit Policy .......................................................................... 3

      C.      NC State silences Grace Christian Life's speech. ................................................. 5

STANDARD OF REVIEW ............................................................................................. 10

ARGUMENT AND CITATION OF AUTHORITIES ................................................... 10

I.      NC State's requirement that students obtain a permit before engaging in almost any type of speech anywhere on campus is unconstitutional .......................... 10

      A.      NC State's speech permit requirement violates the Free Speech Clause of the First Amendment ............................................................ 11

      B.      The Policy violates Grace members' First Amendment rights to exercise their religious beliefs. ...................................................... 26

      C.      NC State's Speech Permit Policy violates Grace's rights to Due Process and Equal Protection ...................................................... 27

II.      Grace will be irreparably harmed absent immediate relief. ............................................. 29

III.      Immediately allowing Grace students to speak about their faith will not harm or disrupt NC State. ............................................................................................. 29

IV.      Upholding Grace's constitutional rights will serve the public interest. ............................ 30

CONCLUSION ................................................................................................................ 30

Certificate of Service ......................................................................................................... i

# TABLE OF AUTHORITIES

**Cases**

*11126 Baltimore Boulevard, Inc. v. Prince George's County,*
   *58 F.3d 988 (1995)* ............................................................................................. 18, 20

*ACLU v. Mote,*
   *423 F.3d 438 (4th Cir. 2005)* ............................................................................... 12, 13

*American-Arab Anti-Discrimination Committee v. City of Dearborn,*
   *418 F.3d 600 (6th Cir. 2005)* ....................................................................................... 22

*Arkansas Educational Television Commission v. Forbes,*
   *523 U.S. 666 (1998)* ............................................................................................... 12, 13

*Auburn Alliance for Peace & Justice v. Martin,*
   *684 F. Supp. 1072 (M.D. Ala. 1988)* ......................................................................... 30

*Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569*
   *(1987)* ..................................................................................................................... 25-26

*Boos v. Barry,*
   *485 U.S. 312 (1988)* ..................................................................................................... 30

*Booth v. Maryland,*
   *327 F.3d 377 (4th Cir. 2003)* ................................................................................. 26, 27

*Chesapeake B & M, Inc. v. Harford County,*
   *58 F.3d 1005 (1995)* ..................................................................................................... 20

*Child Evangelism Fellowship v. Anderson School District,*
   *470 F.3d 1062 (4th Cir. 2006)* .................................................................................... 18

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   *508 U.S. 520 (1993)* ..................................................................................................... 26

*City of Cleburne. v. Cleburne Living Center,*
   *473 U.S. 432 (1985)* ..................................................................................................... 28

*City of Lakewood v. Plain Dealer Publishing Company,*
   *486 U.S. 750 (1988)* ..................................................................................................... 18

*Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,*
   *473 U.S. 788 (1985)* ............................................................................................... 11, 13

*Cox v. City of Charleston,*
    *416 F.3d 281 (4th Cir. 2005)*...................................................................... *passim*

*Douglas v. Brownell,*
    *88 F.3d 1511 (8th Cir. 1996)* ................................................................ 23

*Elrod v. Burns,*
    *427 U.S. 347 (1976)* ............................................................................ 29

*Forsyth County, Georgia v. Nationalist Movement,*
    *505 U.S. 123 (1992)* ...................................................................... 18-19, 25

*Frisby v. Schultz,*
    *487 U.S. 474 (1988)* ............................................................................ 21

*FW/PBS, Inc. v. City of Dallas,*
    *493 U.S. 215 (1990)* ............................................................................ 20

*Gannett Company, Inc. v. DePasquale,*
    *443 U.S. 368 (1979)* ............................................................................ 30

*Giovani Carandola, Ltd. v. Bason,*
    *303 F.3d 507 (4th Cir. 2002)* .......................................................... 29, 30

*Glover v. Cole,*
    *762 F.2d 1197 (4th Cir. 1985)* .............................................................. 15

*Goulart v. Meadows,*
    *345 F.3d 239 (4th Cir. 2003)* .......................................................... 11, 12

*Gregory v. City of Chicago,*
    *394 U.S. 111 (1969)* ............................................................................ 10

*Hague v. CIO,*
    *307 U.S. 496 (1939)* ............................................................................ 14

*Hays County Guardian v. Supple,*
    *969 F.2d 111 (5th Cir. 1992)* ................................................................ 14

*Healy v. James,*
    *408 U.S. 169 (1972)* ................................................................ 1, 10, 14, 17

*Heffron v. International Society for Krishna Consciousness, Inc.,*
    *452 U.S. 640 (1981)* ...................................................................... 14, 24

*Justice for All v. Faulkner,*
    *410 F.3d 760 (5th Cir. 2005)* ................................................................ 15

*Keyishian v. Board of Regents of University of State of New York,*
    *385 U.S. 589 (1967)* ...................................................................... 10

*Knowles v. City of Waco,*
    *462 F.3d 430 (5th Cir. 2006)* ................................................................ 22

*McCutcheon v. Fed. Election Commission,*
    *134 S. Ct. 1434 (2014)* ...................................................................... 17

*McIntyre v. Ohio Elections Commission,*
    *514 U.S. 334 (1995)* ...................................................................... 12, 22

*New York Times Company v. United States,*
    *403 U.S. 713 (1971)* ...................................................................... 17

*NAACP v. Button,*
    *371 U.S. 415 (1963)* ...................................................................... 25

*NAACP v. Claiborne Hardware Company,*
    *458 U.S. 886 (1982)* ...................................................................... 30

*Niemotko v. Maryland,*
    *340 U.S. 268 (1951)* ...................................................................... 19

*OSU Student Alliance v. Ray,*
    *699 F.3d 1053 (9th Cir. 2012)* ................................................................ 15

*Pleasant Grove v. Summum,*
    *555 U.S. 460 (2009)* ...................................................................... 16

*Pro-Life Cougars v. University of Houston,*
    *259 F. Supp. 2d 575 (S.D. Tex. 2003)* ........................................................ 15

*Roberts v. Haragan,*
    *346 F. Supp. 2d 853 (N.D. Tex. 2004)* ........................................................ 15, 23, 24

*Rosenberger v. Rector & Visitors of University of Virginia.,*
    *515 U.S. 819 (1995)* ...................................................................... 15, 16, 30

*Schneider v. New Jersey,*
    *308 U.S. 147 (1939)* ...................................................................... 12

*Shapiro v. Thompson,*
    *394 U.S. 618 (1969)* ........................................................................... 29

*Shuttlesworth v. City of Birmingham,*
    *394 U.S. 147 (1969)* ..................................................................... 19, 20

*Snowden v. Hughes,*
    *321 U.S. 1 (1944)* ............................................................................. 28

*Spartacus Youth League v. Board of Trustees of*
    *Illinois Industrial University,*
    *502 F. Supp. 789 (N.D. Ill. 1980)* .................................................. 15

*Sylvia Development Corporation v. Calvert County,*
    *48 F.3d 810 (4th Cir. 1995)* ...................................................... 27-28

*Thomas v. Chicago Park District,*
    *534 U.S. 316 (2002)* ........................................................................ 18

*Turner Broadcasting System, Inc. v. F.C.C.,*
    *512 U.S. 622 (1994)* ........................................................................ 15

*University and Community College System of Nevada v.*
    *Nevadans for Sound Government,*
    *100 P.3d 179 (Nev. 2004)* ............................................................... 15

*University of Cincinnati Chapter of Young Americans*
    *for Liberty v. Williams,*
    *No. 1:12-cv-155, 2012 WL 2160969 (S.D. Ohio June 12, 2012)* ............... 24

*Ward v. Rock Against Racism,*
    *491 U.S. 781 (1989)* ........................................................................ 21

*Warren v. Fairfax County,*
    *196 F.3d 186 (4th Cir. 1999)* ................................................ 12, 13, 14

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton, 536 U.S.*
    *150 (2002)* ...................................................................... 21, 22, 24

*Widmar v. Vincent,*
    *454 U.S. 263 (1981)* ......................................................... 10, 14, 15, 17

*Winter v. Natural Resources Defense Council, Inc.,*
    *555 U.S. 7 (2008)* ........................................................................... 10

*WV Association of Club Owners & Fraternal Services, Inc. v. Musgrave,* 553 F.3d 292 (4th Cir. 2009)................................................................................................ 10

## INTRODUCTION

The Supreme Court long ago rejected the notion that "First Amendment protections should apply with less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972). Rather, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," as the college campus "is peculiarly the 'marketplace of ideas.'" *Id.*

Ignoring decades of settled precedent, North Carolina State University ("NC State" or the "University") has imposed staggering restrictions on student speech that strike at the core of students' First Amendment rights. Any student that desires to distribute any "written material" or engage in any "oral communication with a passerby" anywhere on campus must first obtain a speech permit from University administrators. And this classic prior restraint provides administrators unbridled discretion to deny students the right to speak. While the administrators purportedly must grant the permit "subject to reasonable time, place, or manner limits," the Speech Permit Policy does not specify any *actual* time, place, or manner limits. The administrators are thus free to deny permits to disfavored speakers based on any reason the administrators can devise. The Policy also allows them to silence any speech that is not "consistent with the University's mission," expressly granting them the power to silence speech based on its content and viewpoint. Because the Policy grants NC State unbridled discretion to license or silence speech, it is plainly unconstitutional.

The Policy also violates the First Amendment because it applies to substantially more speech than is necessary to further any legitimate interest NC State might have for regulating speech. Indeed, the Policy could hardly stretch further. Even a lone student passing a handwritten note or exchanging a "hello" with a passerby does so at his own peril if he has not first secured a permission slip from the school. No legitimate state interest can justify such a

pervasive restriction on free speech. And because NC State cannot police every student's speech, the Policy's breadth invites discriminatory enforcement against disfavored groups.

Finally, the facts of this case show that the Founders were wise to recognize that speech permit regimes present grave risks to unpopular views. Members of Grace Christian Life ("Grace"), a recognized student group that seeks to share a religious message with fellow students, have been repeatedly silenced by school administrators for doing nothing more than telling students about Grace events and engaging them in cordial conversations about religion. Meanwhile, numerous secular groups have been allowed to speak without permits. Thus, the school has not only violated Grace members' free speech rights, it has threatened their right to exercise their faith and has denied them equal protection under the law.

This Court should grant Grace immediate relief from NC State's oppressive Speech Permit Policy. Not only is Grace overwhelmingly likely to prevail on the merits of its claims, each day its members face the threat of severe sanction from the school for nothing more than exercising their First Amendment rights. Grace is thus suffering irreparable harm that requires immediate relief. In contrast, allowing Grace students to speak freely will not harm NC State in any way, but will undoubtedly promote the public's interest in protecting constitutional rights. Accordingly, this Court should grant Grace's motion for a preliminary injunction.

## STATEMENT OF FACTS

### A.     North Carolina State University's campus and Student Union

NC State is a public university organized and existing under the laws of the State of North Carolina, and its operations are funded in part by the state. The University's campus is composed of various publicly-accessible buildings and outdoor areas, including public streets, sidewalks, open-air quadrangles, and parks. *See* Ex. 1, Campus Map. The outdoor areas of campus are open to the public, with no gates or barriers to pedestrian entry. Expressive activity

can occur in these areas without blocking anyone's access to buildings and sidewalks or otherwise interfering with the University's educational environment.

The University recently completed renovations of the Talley Student Union and designed it to be a "new campus hub." Ex. 2, NC State News article (Sept. 8, 2015). "More than 10,000 people pass through Talley each day, stopping to eat at one of eight restaurants and cafes, conferring with fellow students in meeting and lounging spaces, catching a performance at Stewart Theatre or working with one of the student engagement and diversity offices housed there." Ex. 2. Talley is thus a common area on campus that serves as both a vital crossroads and central destination where students go to connect with each other and the broader campus community. *See* Compl. ¶¶ 56-58; Ex. 3, TJ Willis (@willistj), Twitter (Mar. 22, 2016, 2:57 PM EST).

### B.      NC State's Speech Permit Policy

NC State currently imposes a broad Speech Permit Policy (the "Policy") that requires any student or group to obtain prior written permission from school administrators before engaging in almost any type of speech anywhere on campus. *See* NC State Reg. 07.25.12, Ex. 4. The Policy extends to both "commercial solicitation"—which NC State defines as "any proposal to sell, seeking or asking of an offer to buy, dissemination of information for the purpose of facilitating the sale of goods or services," Policy § 2.3—and "non-commercial solicitation," which includes "any distribution of leaflets, brochures or other written material, or oral speech to … passersby, conducted without intent to obtain commercial or private pecuniary gain." *Id*. § 2.4. NC State's definition of non-commercial solicitation "does not include the dissemination of information for purposes of the administrative, academic, research, or extension activities of the University." *Id*.

The Policy provides that "[g]roups or individuals wishing to conduct any form of solicitation on University premises must have the written permission of Student Involvement in advance." *Id.* § 3.1. And if students wish to speak at University facilities, their speech must also be preapproved "by the administrator responsible for the facility or location where the activity is to be held," *id.*, and the students must sign a Facility Use Agreement, *id.* § 5.2.4.

Under the Policy, NC State administrators are given unbridled discretion to decide whether to grant or deny speech permits. While the Policy provides that "[p]ermission from the Student Involvement will be granted," administrators can deny permission based on unspecified "reasonable time, place, or manner limits." *Id.* § 3.3. Moreover, administrators are given the authority to deny a permit if the proposed speech is not "consistent with the University's mission and purpose of the location." *Id.* Finally, the Policy does not impose any timeline on when the administrators must decide whether to approve or deny a request for a speech permit.

The penalties for students and groups that speak without a speech permit can be severe. Section 5.2 states that if students distribute "printed materials" without required permits, NC State may issue a trespass order, which is a Class 3 misdemeanor in North Carolina. *Id.* § 5.2.3(d) (citing N.C. Gen. Stat. § 14-159.13). Thus, NC State has claimed the power to treat its students' speech as a crime.

Even if NC State officials decide that students who speak without a permit are not subject to criminal prosecution, they may still face University disciplinary proceedings. NC State's Code of Student Conduct provides that any "[v]iolation of any written policies, regulations, or rules of the University" is "non-academic misconduct" "that will be subject to disciplinary action." Ex. 5, NC State Policy 11.35.01 § 10.20. These sanctions range from a written warning to suspension to even expulsion. *See id.* §§ 11.1-11.4.

NC State also reserves the right to impose sanctions on student groups and organizations that distribute written materials or talk to other students without a permit, including "revocation or denial of registration or recognition," *id*. § 11.7, and holding officers "collectively or individually responsible," *id*. § 5.4.1.

C. **NC State silences Grace Christian Life's speech.**

For more than 20 years, Grace Christian Life ("Grace") has been an officially registered and recognized student organization at NC State. Grace's mission is to spread the message of Jesus and His church to all people everywhere, and Grace uses a variety of means to express this message. Grace hosts Bible studies, weekend worship services, and related events on campus that it invites students to attend using flyers, signs, pamphlets, and other written materials. And students in Grace also communicate their Christian religious message directly to fellow students across campus. Grace sometimes obtains permission from NC State to set up information tables on campus to formally spread word about their events and about their Christian faith. At other times, individual Grace members will engage in spontaneous and informal conversations with other students about religion, either sharing a religious message with students or inviting them to a Grace event to learn more about Christianity. During some, but not all, of these discussions, Grace members will offer students written materials about Christianity or Grace events.

In early September 2015, Todd Valentine, a Grace student member, and Thommy Saunders, a Grace staff member authorized by the University to be on campus, went to Talley to engage with students in religious discussions and invite them to attend Grace worship services or other events. Defendant TJ Willis, Associate Director of University Student Centers at NC State, observed Valentine and Saunders having religious discussions with students. Willis instructed Valentine and Saunders that by approaching students to engage in religious discussions, they

5

were violating NC State's policy against speaking on campus without a permit. Rather than risk University sanctions, Valentine and Saunders stopped speaking with students.

Shortly thereafter, Willis reported to Defendant Mike Giancola—Associate Vice Provost at NC State—that Grace members had been sharing their faith with students in Talley without a permit. Willis had seen "an individual named Tommy who works with Grace who is essentially soliciting throughout the building. He walks up to a single person or duo of persons, starts with a hello and then starts the conversation into religion, ending with giving them a card." Ex. 6, Email from Willis to Giancola (Sept. 11, 2015). Willis opined that these actions "would fall under the university [regulation] of solicitation (Non-commercial)," and that approaching students was forbidden and "different than the many other religious (and non-religious) groups we have to reserve a lobby table, host a bible study in a location or have people meet them in a specific location." *Id*. Willis stated that NC State administrators "have been enforcing the [Policy] and have stopped groups of all kinds (commercial, religious, etc) from passing out info in and around the facility which helps to create that inclusive, welcoming environment." *Id*.

Giancola forwarded Willis's e-mail to Ann Pearce, Director of the Chaplains' Cooperative Ministry ("CCM") at NC State, and on September 15, 2015, Pearce forwarded the e-mail to Saunders and two other Grace members. Ex. 6, Email from Pearce to Russ, et al. (Sept. 15, 2015). Pearce told Grace that it had been engaging in "improper solicitation" and "disregarding the University's policy on undue solicitation in Talley Student Union." *Id*. According to Pearce, even with a speech permit, Grace's "type of solicitation is not allowed." *Id*. Giancola later attended a CCM membership meeting to warn them that they were not allowed to initiate conversations with students "under one pretense different from the intended purpose [of] inviting involvement in a certain ministry." Compl. ¶ 95.

On January 27, 2016, Grace set up a table in Talley with the prior permission of the University. *Id.* ¶ 101. When Grace obtained the speech permit, an employee of NC State's Student Involvement Office informed Grace that its members were not required to remain behind the table, but that they were allowed to walk around and engage students in conversation. *Id.* ¶ 102. Thus, after setting up their table, some Grace members ventured out from behind the table to engage students in conversation. *Id.* ¶ 103. Shortly thereafter, an employee from the Student Involvement Office interrupted Grace's members to tell them that they were required to remain behind the table and that they could only speak to students who came to the table to first engage them in conversation. *Id.* ¶ 104. While Grace members wanted to continue speaking to students throughout Talley, they retreated to behind their table to avoid any University sanctions.

While Willis stated that NC State has been enforcing its Speech Permit Policy uniformly against all groups, Grace members have repeatedly witnessed other students and groups distributing written materials and speaking to students throughout Talley and across the wider campus without speech permits. For example, on January 27, 2016, a Grace student member witnessed an individual inside Talley handing out political flyers. The Grace member approached the individual and inquired whether he had obtained a permit from the University. The individual replied, "It's Talley; you don't need a permit to talk to people." *Id.* ¶ 107. Likewise, on February 3, 2016, a Grace student member saw a Red Cross representative venturing beyond the organization's information table to pass out flyers to students in Talley. *Id.* ¶ 108. And on February 8, 2016, a Grace student member witnessed two men talking with students outside Talley. The two men indicated that they were with a group called www.workforstudentsnow.com, and they were approaching students to record the names and e-mails of students interested in jobs and internships. The Grace member asked the men whether

they had obtained a permit, and they replied that they had not obtained a permit and were not aware that a permit was required. *Id*. ¶ 109. On March 30, 2016, a representative from a group hosting a table in Talley was walking around handing out pamphlets to students in clear view of Defendant Willis. However, Willis did not take any action to stop them from passing out the material. *Id.* ¶ 112. Thus, while NC State has been quick to stifle Grace's religious speech on multiple occasions, it has not sought to place similar restrictions on other students and student groups sharing secular messages.

Just two months after Willis forced Valentine and Saunders to stop speaking to students in Talley, NC State severed its relationship with CCM, which greatly restricted access to campus for non-student representatives of Grace, like Saunders. CCM was an independent, interfaith organization that supported individual campus ministries and planned jointly sponsored interfaith programs for students, faculty and staff. Religious student organizations had the option to become member organizations of CCM and participate in its activities. One of the benefits of joining CCM was that non-student ministry leaders of the organizations were issued University identification cards, University e-mail accounts, and parking passes, which allowed these ministry leaders access to campus facilities that are typically reserved for University students and employees. *Id.* ¶ 93. Grace was a member of CCM, and Saunders was one of Grace's authorized representatives at the time he was silenced by Willis. In November 2015, NC State informed Grace that the University was terminating its 40-year relationship with CCM because "the current environment of diversity and faith traditions within the university is not shown or mirrored well within CCM as it currently exists." Ex. 7, Email from Phillips to CCM members (Nov. 9, 2015). In short, the University determined that CCM contained too many groups that identified with the Christian faith. As a result of the University's decision, CCM members were

no longer allowed to receive University-issued identification cards or rent the CCM office, and ministry leaders like Saunders lost the right to access certain parts of campus. Shortly thereafter, CCM members voted to dissolve CCM.

On December 2, 2015, Grace reached out to NC State's general counsel to inform the school that its Speech Permit Policy was unconstitutional and to request that the University revise the Policy. Ex. 8, Langhofer Letter to Goldgeier (Dec. 2, 2015). The following week, the University's assistant general counsel, Shawn Troxler, replied that its Policy was properly applied to Grace and that the Policy's restrictions on speech did not violate the First Amendment rights of Grace or its members. Ex. 9, Troxler Letter to Langhofer (Dec. 8, 2015). On January 6, 2016, Grace e-mailed Troxler to determine whether the Policy requires a student to obtain a permit from the University any time a student desires to hand out written material to another student. Ex. 10, Langhofer Email to Troxler (Jan. 6, 2016). Troxler replied that "if a student desires to hand out such material he or she should obtain a permit from the university's Student Involvement Office." Ex. 11, Troxler Email to Langhofer (Jan. 19, 2016).

NC State's decision to maintain its broad Speech Permit Policy has severely curtailed Grace's ability to share its message on campus. Grace members have wanted to engage in conversations with other students and hand out literature, both inside and outside of Talley, without the need to obtain the prior permission of the University every time an opportunity for dialogue arises. Grace members have also wanted to distribute literature outside of Grace's reserved speech zone in Talley so they can reach a larger audience. But since NC State's recent crackdown, Grace members have been forced to stop even having certain types of conversations with fellow students in public lest they risk Grace's status as a student organization and their own ability to continue attending NC State. Because NC State's Policy has been used to silence

Grace student members' protected speech and continues to have a chilling effect on their right to express and live out their beliefs, Grace filed this lawsuit.

## STANDARD OF REVIEW

A preliminary injunction is appropriate when a plaintiff establishes "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7 (2008)). Grace readily satisfies all four of these factors.

## ARGUMENT AND CITATION OF AUTHORITIES

I. **NC State's requirement that students obtain a permit before engaging in almost any type of speech anywhere on campus is unconstitutional.**

Grace is likely to succeed on the merits of its claim because NC State's Policy—which requires students to obtain the school's written permission before engaging in almost any type of expression anywhere on campus—is invalid both facially and as applied under the Constitution's First and Fourteenth Amendments. Freedom of expression is an essential ingredient of liberty that must be jealously guarded. *See Gregory v. City of Chicago*, 394 U.S. 111 (1969). And "[w]ith respect to persons entitled to be there," the Supreme Court has left "no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Widmar v. Vincent*, 454 U.S. 263, 268-69 (1981). "[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). Rather, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (quotation marks omitted). NC State's requirement that students

obtain speech permits before distributing written material or even speaking to their fellow students is as broad a prior restraint on speech as this Court is likely to ever see. It is plainly unconstitutional both on its face and as applied to Grace.

NC State's Policy also violates Grace's rights to due process and equal protection. The Policy subjects students to University sanctions and potentially criminal liability if they distribute any "written material" or engage in any "oral speech to a passersby [sic]" anywhere on campus without the school's prior written permission. Policy §§ 2.4, 3.1. The Policy is so vague and capacious as to cover almost any public human interaction, making it impossible for students to know what is illicit conduct and inviting arbitrary and discriminatory enforcement by the school. The Policy thus deprives students of the most fundamental due process protections.

And Grace's fears of discriminatory enforcement have been borne out. While NC State has consistently declined to apply its Policy to students and groups sharing secular messages, it has repeatedly used the Policy to silence attempts by Grace members to share their Christian faith. NC State's recent decision to terminate its decades-long relationship with CCM because the organization was composed of, in NC State's judgment, too many Christian groups further confirms that the school's Policy not only can be used to target disfavored speech, it has been used for that very purpose—a plain violation of Grace's right to equal protection under the law.

**A.    NC State's speech permit requirement violates the Free Speech Clause of the First Amendment.**

**1.    Grace's speech is protected by the First Amendment.**

"The first inquiry a court must undertake when a First Amendment claim is asserted is whether the plaintiff has engaged in 'protected speech.'" *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 797 (1985)). Here, there is no doubt that Grace's speech is protected. Grace members seek to share

their religious faith with other students and encourage students to attend Grace events, and they use common methods to communicate their message, including handing out flyers and pamphlets and engaging in cordial conversations. These activities and forms of speech lie at the very "foundation of free government by free men." *Schneider v. New Jersey*, 308 U.S. 147, 151 (1939); *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (discussing handbilling). Grace's speech is thus clearly protected.

### 2. NC State's Speech Permit Policy applies to public fora.

Because Grace's speech is protected, the Court must next identify the type of fora covered by NC State's speech restrictions, as "the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Goulart*, 345 F.3d at 246. "The three recognized types of fora are the traditional public forum, the nonpublic forum, and the designated or limited public forum." *Id.* at 248.

First, "[a] traditional public forum, such as streets, sidewalks, and parks, requires the government to accommodate all speakers, because these places have the characteristics of a public thoroughfare, a purpose that is compatible with expressive conduct, as well as a tradition and history of being used for expressive conduct." *ACLU v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005). "Access to traditional public fora may be limited only by content-neutral and reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Warren v. Fairfax Cty.*, 196 F.3d 186, 192 (4th Cir. 1999) (quotation marks omitted). Any government exclusion of a speaker based on his or her identity is unconstitutional unless "the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id.* (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)).

12

Second, for nonpublic fora the government can impose restrictions on speech "as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Ark. Educ.*, 523 U.S. at 677-78.

Finally, "a limited or designated public forum … is one that is not traditionally public, but the government has purposefully opened to the public, or some segment of the public, for expressive activity." *Mote*, 423 F.3d at 443. "The government creates a designated public forum when it purposefully makes property 'generally available' to a class of speakers." *Warren*, 196 F.3d at 193 (quoting *Ark. Educ.*, 523 U.S. at 677). "Two levels of First Amendment analysis are applicable to limited public fora" depending on the class of the speaker. *Id*. "First, is the 'internal standard'—'[i]f the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available, its action is subject to strict scrutiny.'" *Id*. (quoting *Ark. Educ.*, 523 U.S. at 677) (alterations in original). Thus, for this class of speakers, "a limited public forum is treated as a traditional public forum." *Id*. In contrast, the "external standard" applies to the government's decision to select the classes of speakers who can use the forum, and this "selection of a class by the government must only be viewpoint neutral and reasonable in light of the objective purposes served by the forum." *Id*. at 194.

To determine whether a forum is public or nonpublic, courts consider whether the place is one "which by long tradition or by government fiat ha[s] been devoted to assembly and debate." *Cornelius*, 473 U.S. at 817 (quotation marks omitted). If the forum, absent the government's attempted speech restrictions, "has the objective use and purpose of a traditional public forum,"—i.e., "[i]ts objective use is as a place of open public access"—then the place "is eminently compatible with expressive activity" and is a public forum. *Warren*, 196 F.3d at 190.

NC State's publicly-accessible buildings and outdoor areas including sidewalks, quadrangles, and other common areas like Talley Student Union are undoubtedly public fora for students, if not the broader public. The campus is maintained like a park with large cultivated grassy areas, trees, benches, and sidewalks. It has many suitable streets, sidewalks, open-air quadrangles, parks, and open spaces, which are the "prototypical examples of traditional public fora." *Id.*. Likewise, Talley Student Union serves as a "campus hub" for thousands of students that meet there to eat, work, and otherwise connect with their fellow students. As Defendant Willis recently put it, student unions like Talley "are critical to [building] campus community—connecting [people] & stories." Ex. 3, TJ Willis (@willistj), Twitter (Mar. 22, 2016, 2:57 PM EST). Thus, at least for students, the "objective use" of common areas like Talley are as "place[s] of open public access, which [are] eminently compatible with expressive activity." *Warren*, 196 F.3d at 189-90.

This conclusion is confirmed by decisions from numerous courts. The Supreme Court "has recognized that the campus of a public university, at least for its students, possesses many of the characteristics of a public forum." *Widmar*, 454 U.S. at 268 n.5. Likewise, the Fifth Circuit has held that "[t]he campus's function as the site of a community of full-time residents makes it 'a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment,'" *Hays Cty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992) (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness,* 452 U.S. 640, 651 (1981)), which plainly "suggests an intended role more akin to a public street or park than a non-public forum." *Id.* (citing *Hague v. CIO,* 307 U.S. 496, 515 (1939)). And the Supreme Court has left "no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at

180.  Rather, the need to protect speech on campus is, if anything, heightened as the "college milieu is the quintessential 'marketplace of ideas.'"  *Glover v. Cole*, 762 F.2d 1197, 1200 (4th Cir. 1985).  Accordingly, courts have held time and again that common spaces on public university campuses like NC State's are public fora for students,[1] and government restrictions on student speech "must be subjected to the level of scrutiny appropriate to any form of prior restraint."  *Widmar*, 454 U.S. at 268 n.5.  Thus, NC State's campus-wide restrictions on student speech must be analyzed under the same exacting standard courts apply to any government restrictions on speech in public fora.

### 3.     The Policy allows for content- and viewpoint-based discrimination.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).  "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based."  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994).  "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all

---

[1] *See OSU Student Alliance v. Ray*, 699 F.3d 1053, 1062-63 (9th Cir. 2012) (holding Oregon State University campus is "at least a designated public forum" for students); *Justice for All v. Faulkner*, 410 F.3d 760, 769 (5th Cir. 2005) (holding that "outdoor open areas of [University of Texas] campus generally accessible to students—such as plazas and sidewalks" are "public forums for student speech"); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 861 (N.D. Tex. 2004) (holding that "to the extent the [Texas Tech University] campus has park areas, sidewalks, streets, or other similar common areas, these areas are public forums, at least for the University's students, irrespective of whether the University has so designated them or not"); *Pro-Life Cougars v. Univ. of Hous.*, 259 F. Supp. 2d 575, 582 (S.D. Tex. 2003) (finding university grounds are public fora designated for student speech); *Spartacus Youth League v. Bd. of Trustees of Ill. Indus. Univ.*, 502 F. Supp. 789, 799 (N.D. Ill. 1980) (holding student union and campus walkways were public fora and that "[p]eaceful distribution of literature is compatible with the normal activity of the student union"); *Univ. and Cmty. Coll. Sys. of Nev. v. Nev. for Sound Gov't*, 100 P.3d 179, 190 (Nev. 2004) ("Typically, when reviewing restrictions placed on students' speech activities, courts have found university campuses to be designated public forums.").

the more blatant." *Rosenberger*, 515 U.S. at 829. Thus, the government cannot "exercise viewpoint discrimination" even in a "limited public forum … of its own creation," much less in a public forum. *Id.*

Under this established framework, NC State's Policy must fail because it expressly allows the University to discriminate against student speech whenever an administrator concludes that the proposed speech is not "consistent with the University's mission." Policy § 3.3. Under the Policy, NC State can silence student speech that is unpopular, controversial, or simply critical of the school on the grounds that such views are inconsistent with the University's "mission." Because such "restrictions based on viewpoint are prohibited" by the First Amendment, *Pleasant Grove v. Summum*, 555 U.S. 460, 469 (2009), NC State's Policy should be enjoined.

Moreover, Defendants have enforced the Policy against Grace based on viewpoint. Defendants Willis and Giancola informed Grace members multiple times that they may not walk around Talley and engage students in religious conversations without obtaining a permit. Compl. ¶¶ 87, 94. Yet, Grace members have observed individuals from many other organizations handing out literature and engaging in secular conversations with students both inside and outside of Talley without a permit. *Id.* ¶¶ 100-112. On several of those occasions, this activity was conducted while Defendant Willis was present, but Defendant Willis did not stop the other organizations from handing out literature or speaking with other students. *Id.* On October 6, 2015, Defendant Giancola attended a CCM meeting to advise its members about the speech restrictions imposed by the Policy. *Id.* ¶ 94. Defendant Giancola stated that "solicitation is not allowed when conversation is initiated under one pretense different from the intended purpose ... inviting involvement in a certain ministry." *Id.* By their own admission, Defendants are

enforcing the Policy based upon the content and the religious viewpoint of the conversations. This type of content and viewpoint discrimination is strictly forbidden by the First Amendment. Accordingly, the Policy is unconstitutional and should be enjoined.

### 4. The Policy is an unlawful prior restraint.

Over four decades ago, the Supreme Court ruled that because "students enjoy First Amendment rights of speech and association on the [college] campus … the 'denial of use of campus facilities for … appropriate purposes' must be subjected to the level of scrutiny appropriate to any form of prior restraint." *Widmar*, 454 U.S. at 267 n.5 (citing *Healy*, 408 U.S. at 181, 184). "An ordinance that requires individuals or groups to obtain a permit before engaging in protected speech is a prior restraint on speech." *Cox v. City of Charleston*, 416 F.3d 281, 284 (4th Cir. 2005). The Speech Permit Policy requires Grace to obtain permission prior to speaking anywhere on campus. Compl. ¶¶ 68. This is a prior restraint on Grace's speech.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1452 (2014). "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971). To overcome the "heavy presumption" against the constitutionality of prior restraints, Defendants must show that the Policy is a reasonable time, place, and manner regulation, meaning that the Policy (1) is content neutral, (2) is "narrowly tailored to serve a significant governmental interest," and (3) "leave[s] open ample alternatives for communication," *Cox*, 416 F.3d at 286. Defendants' Policy must fail only one of these requirements to render it unconstitutional, but the Policy fails all of them.

**a. The Policy grants NC State unfettered discretion to decide which students are allowed to speak.**

Even if the Policy were content neutral—and it is not—it "may not possess unfettered discretion to burden or ban speech, because 'without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or view-point of the speaker.'" *Child Evangelism Fellowship v. Anderson Sch. Dist.*, 470 F.3d 1062, 1068 (4th Cir. 2006) (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763-64 (1988)).

NC State's Policy not only extends broadly, but also grants its enforcers broad discretion to determine which students will be given the right to speak. While the Policy provides that speech permits "will be granted, subject to reasonable time, place, or manner limits," the Policy does not spell out any *actual* time, place, or manner restrictions or define what the school would deem "reasonable," thus handing administrators unbridled power to silence speech based on whatever ostensibly objective reasons they make up as they go. *Id.* § 3.3.

The Supreme Court has recognized the potential for such abuse, noting that "even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002). That is why the Court has "required that a time, place, and manner regulation contain *adequate standards* to guide the official's decision and render it subject to effective judicial review." *Id.* (emphasis added). Indeed, "[w]ithout the constraint of *specific* standards to guide the decisionmaker in judging whether a license should issue, an impermissible danger exists that a government official may decide to exercise his judgment to suppress speech he personally finds distasteful or that an applicant may feel compelled to censor his own speech." *11126 Baltimore Blvd. Inc. v. Prince George's Cty.*, 58 F.3d 988, 994 (1995) (emphasis added); *see also Forsyth Cty., Ga. v.*

*Nationalist Movement*, 505 U.S. 123, 133 (1992) (striking down law that did not "prevent[] the official from encouraging some views and discouraging others through … arbitrary application"). NC State's Policy utterly fails this constitutional test. Under the Policy's capacious standard, it is easy to imagine school administrators identifying speech they disfavor and then devising pretextual "time, place, and manner" reasons for denying a speech permit. That is precisely why the Constitution requires more than the bare reproduction of the words "time, place, and manner" in speech licensing regulations. Because NC State's Policy lacks "narrowly drawn, reasonable and definite standards for the officials to follow," it "must be invalid." *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951).

And in addition to the fact that the "reasonable time, place, or manner limits" mentioned in the Policy do not sufficiently hem in the administrators' discretion, the Policy also includes a backdoor that expressly grants NC State the authority to silence student speech based on its content and viewpoint. The Policy provides that "permission may be limited to solicitation that is consistent with the University's mission and purpose of the location." Policy § 3.3. School administrators are thus given carte blanche to limit students' right to speak based on the students' proposed messages. In this way, NC State's Policy is materially indistinguishable from the ordinance struck down in *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969). There, Birmingham required anyone who sought to organize or hold a parade or procession on public streets to first obtain a permit from the city commission. *Id*. at 149. The commission was required to grant the request for a permit "unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." *Id*. at 149-50. In striking down the ordinance, the Court held that "[t]here can be no doubt that the Birmingham ordinance, as it was written, conferred upon the City Commission virtually

unbridled and absolute power to prohibit" parades and processions, because the commission's members were "guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.'" *Id*. at 150. Likewise, NC State can restrict any student's right to speak based solely on an administrator's view of whether the speech is "consistent with the University's mission." Because NC State's Policy grants this unbridled censorship power to school officials, the Policy "f[a]ll[s] squarely within the ambit of the many decisions of" the Supreme Court "holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Id*. at 150-51.

The Policy also fails for the independent reason that it does not require NC State to grant or deny a request for a speech permit within any set timeframe. "[W]ithout procedural safeguards to ensure a prompt resolution, an applicant may conclude that seeking a determination is too burdensome a task to pursue, impermissibly chilling the exercise of protected speech." *11126 Baltimore Blvd*., 58 F.3d at 994. Thus, the Supreme Court has "held that the failure to place limitations on the time within which a censorship board decisionmaker must make a determination … is a species of unbridled discretion." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990). This additional form of unbridled discretion also renders the Speech Permit Policy "unenforceable" both on its face and as applied to Grace. *Chesapeake B & M, Inc. v. Harford Cty.*, 58 F.3d 1005, 1011 (1995).

> **b.    The Policy is not narrowly tailored to serve a significant government interest.**

NC State's Speech Permit Policy fails for the separate but related reason that it is not narrowly tailored to serve a substantial government interest. To be constitutionally valid, the Policy must promote a "substantial government interest that would be achieved less effectively

absent the regulation," but must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). In other words, the Policy must be so narrowly tailored that it "targets and eliminates no more than the exact source of the evil it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (internal quotation and citation omitted). The Policy plainly sweeps far more broadly than necessary to promote the school's interest in public order and safety. And the University has no valid interest in silencing student speech merely because it is not "consistent with the University's mission." Policy § 3.3.

To engage in any expressive activity anywhere on campus, Grace members must obtain the written permission of one or more NC State administrators. *Id*. §§ 3.1, 5.2.4. "The mere fact that the [Policy] covers so much speech raises constitutional concerns." *Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 165 (2002). For example, spontaneous expression is completely prohibited by the Policy—a clear-cut First Amendment violation. *Id*. at 166-67. In *Cox*, the Fourth Circuit held that an ordinance that required any group—no matter how small—to obtain a permit before engaging in any parade, meeting or procession on the city streets or sidewalks was plainly overbroad and facially unconstitutional. 416 F.3d at 286. While the city has an interest in ensuring "the safety, order, and accessibility of city streets and sidewalks, it does so at too high a cost, namely, by significantly restricting a substantial quantity of speech that does not impede the City's permissible goals." *Id*. at 285. For example, though "[s]pontaneous expression … is often the most effective kind of expression," under the ordinance not even a group of three friends who "come upon a newspaper stand displaying a headline that outrages them" could stage a peaceful protest unless they "first visited the city administrator (assuming his office was open at the time), filed the appropriate permit

application, and obtained a permit"—an unconstitutional (and absurd) outcome.  *Id*. at 286.

Thus, *a fortiori*, NC State's even broader Policy "facially violates the First Amendment."  *Id*.

NC State's universal permitting requirement prohibits not only spontaneous speech, but anonymous speech as well—further confirmation that the Policy violates the First Amendment. Any students who wish to engage in any speech on campus must first identify themselves to University authorities by requesting permission to speak.  But as the Supreme Court has recognized, there are many valid reasons why speakers might not want to identify themselves, including "fear of economic or official retaliation, … concern about social ostracism, or merely … a desire to preserve as much of one's privacy as possible."  *Watchtower Bible*, 536 U.S. at 166.  "Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent."  *McIntyre*, 514 U.S. at 357. Whatever NC State's purported interest for requiring speech permits, it provides no support for the Policy's disallowance of anonymous speech, a crucial "shield from the tyranny of the majority."  *Id*.

Numerous courts have recognized that broad speech permit requirements like NC State's are unconstitutionally overbroad because they apply not only to large groups, but also to individual speakers and small gatherings.  For example, in *Cox*, the Fourth Circuit held that the city's permit requirement was unconstitutional because it applied even to "a small meeting of individuals who gather on the sidewalk … to hand out religious tracts …, even if their expression does nothing to disturb or disrupt the flow of sidewalk traffic."  416 F.3d at 286.[2]  Thus, while

---

[2] *See also Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest"); *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) ("Permit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow

NC State may have a legitimate need to regulate a hundred-person march or a raucous concert, it has no comparable need to insert itself whenever an individual student desires to hand out a lone flyer or have a brief conversation with another person at the student union. Yet under the school's totalitarian policy, a single student cannot share her religious faith with another without obtaining NC State's blessing. A student who sees another student lost and looking for a classroom or event could face sanction for writing out directions or telling the student where to go. Even a student heading to Talley for lunch who spots a friend heading to the library could conceivably require a University permission slip before inviting her friend to join her. This boundless Policy plainly "burdens substantially more speech than is necessary to further the government's legitimate interests and therefore facially violates the First Amendment." *Id*. (quotation marks and citations omitted). And because the Policy has been applied to stop even the smallest groups of Grace students from speaking or handing out written materials—actions so unobtrusive that NC State has no legitimate interest in halting them—the Policy is also unconstitutional as applied to Grace.

When other public universities have tried to force their students to ask for permission before engaging in any type of protected speech, courts have not hesitated to invalidate those infantilizing restrictions. In *Roberts v. Haragan*, Texas Tech University required any student that wanted to speak outside of the school's designated free speech zones to obtain the school's prior permission. 346 F. Supp. 2d 853, 868-69 (N.D. Tex. 2004). The court concluded that "even though the University may indeed have a significant interest in controlling some expressive activities," it could not establish "that burdening all expressive activities in public forums with

tailoring."); *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) ("applying the permit requirement to groups as small as ten persons compounds our conclusion that the parade permit ordinance is not narrowly tailored").

its prior permission requirement is necessary to serve its significant interests." *Id*. at 869-70. The Southern District of Ohio reached the same conclusion when evaluating the University of Cincinnati's similar prohibition against students speaking without the school's prior approval. *Univ. of Cincinnati Chapter of Young Americans for Liberty v. Williams*, No. 1:12-cv-155, 2012 WL 2160969, at *6-7 (S.D. Ohio June 12, 2012). The court found it "offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so," *Williams*, 2012 WL 2160969, at *6 (quoting *Watchtower,* 536 U.S. at 165–66), and held that such a broad regulation was not narrowly tailored, *id*. at *7. The same result should follow here. By requiring every student to obtain a permission slip before engaging in any speech anywhere on campus, NC State infantilizes its students and assaults their First Amendment rights. A government speech restriction of such breathtaking scope cannot be justified by any significant governmental interest and has no place in a free society.

> ### c. The Policy does not leave open ample alternative channels of communication.

The Speech Permit Policy does not provide "ample alternative channels of communication." *Cox*, 416 F.3d at 286. The Policy bans virtually all speech anywhere on campus without obtaining a prior permit. In other words, under the Policy, there are no areas of the campus *not* covered by the permit requirement. "The First Amendment protects the right of every citizen to reach the minds of willing listeners and to do so there must be opportunity to win their attention." *Heffron,* 452 U.S. at 655 (quotations omitted). The Policy forbids Grace from all communication with other students on campus including distribution of written material or oral speech to passersby without first obtaining a permit. Grace is completely prevented from

reaching its intended audience. Thus, the Policy does not leave open *any*—not to mention, ample—alternative channels of communication.

Restrictions on speech must satisfy all three criteria for prior restraints to be valid. Defendants' Policy fails all three. Therefore, Grace is likely to prevail on the merits of its claim.

### 5. The Policy is unconstitutionally overbroad.

"It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth*, 505 U.S. at 129. "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).

NC State's requirement that students obtain speech permits from school administrators before engaging in nearly any form of First Amendment activity anywhere on campus is plainly unconstitutional on its face. Indeed, the Policy is a textbook example of the sort of "[b]road prophylactic rules in the area of free expression" that the Supreme Court has found inherently "suspect." *NAACP v. Button*, 371 U.S. 415, 438 (1963). The scope of speech covered is staggering. Any student who wishes to engage in any "distribution of leaflets, brochures or other written material, or oral speech to a passersby [sic]" anywhere on campus must obtain written permission from one or more University administrators. Policy §§ 2.3, 3.1. A student cannot hand out a newspaper, pamphlet, or even a handwritten note without first obtaining the University's blessing. And the Policy even requires students to ask permission before engaging in impromptu conversations with any of the thousands of people who cross NC State's campus each day. "Under such a sweeping ban, virtually every individual who enters" NC State's

campus "may be found to violate the resolution by engaging in some 'First Amendment activit[y].'" *Jews for Jesus*, 482 U.S. at 574. It is "obvious that such a ban cannot be justified" even if NC State's campus "were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech." *Id.*

## B. The Policy violates Grace members' First Amendment rights to exercise their religious beliefs.

"The Free Exercise Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, forbids the adoption of laws designed to suppress religious beliefs or practices unless justified by a compelling governmental interest and narrowly tailored to meet that interest." *Booth v. Maryland*, 327 F.3d 377, 380 (4th Cir. 2003) (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531 (1993)). "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi*, 508 U.S. at 531. But the inquiry into a free exercise challenge does not "end with the text of the laws at issue." *Id*. at 534. "The Clause forbids subtle departures from neutrality and covert suppression of particular religious beliefs," and courts thus "must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Id*.

NC State has undoubtedly targeted Grace's "religious conduct for distinctive treatment" in violation of Grace's free exercise rights. *Booth*, 327 F.3d at 380. While NC State has declined to enforce its Policy against many students, student groups, and even off-campus groups that have distributed literature promoting secular messages, NC State has repeatedly intervened to stop Grace members from sharing their Christian faith. Compl. ¶¶ 86-92, 101-04, 112. Even after Grace obtained a permit to set up an informational table in Talley, an NC State employee ordered Grace members to stop approaching students. Instead, Grace members were required to

remain behind the table and hope that others would approach them to hear their message—a requirement that has not applied to other groups promoting secular messages. *Id.* ¶¶ 101-04, 112.

And in November 2015, NC State severed its relationship with CCM which greatly restricted access to campus for non-student representatives of Grace, like Saunders. NC State had partnered with CCM for decades, granting the various faith-based groups in CCM privileges like access to campus for their designated representatives. *Id.* ¶ 93. But in September 2015, Willis complained to Giancola about Saunders's religious conversations with students. Two months later, NC State terminated all privileges for CCM members, citing the fact that too many of them were Christian groups. *Id.* ¶ 96. As Giancola explained, "[t]he university made the decision to change its relationship with the Chaplains' Cooperative Ministry in large part because the ministry did not represent the diverse traditions of religions here at State." Ex. 12, NCSU Distances Itself from Pluralistic Ministry, Technician, Jan. 5, 2016.

By repeatedly allowing students and groups that are similarly situated to Grace to speak without permits, while singling out Grace for enforcement action, NC State has violated Grace's free exercise rights. "[T]he legitimate secular purposes underlying the policy have been abandoned in a manner that favors other" secular speakers over Grace's religious practice and thus "the policy has been applied to [Grace] in an unconstitutional manner." *Booth*, 327 F.3d at 381.

## C. NC State's Speech Permit Policy violates Grace's rights to Due Process and Equal Protection.

The Fourteenth Amendment's "Equal Protection Clause limits *all* state action, prohibiting any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Thus, even if a state regulation "is facially neutral, its administration or

enforcement can effect an unequal application by favoring one class of persons and disfavoring another." *Id*. at 818-19. If the regulation does not state a classification, "the plaintiff bears the initial burden of proving that a classification was nonetheless intentionally utilized." *Id*. at 819 (citing *Snowden v. Hughes,* 321 U.S. 1, 8 (1944)). To do so, the plaintiff must show that the state "*intended* to discriminate" against the plaintiff's group. *Id*. In determining whether state action was "motivated by discriminatory intent," courts have considered several factors, including (1) "evidence of a 'consistent pattern' of actions by the decisionmaking body disparately impacting members of a particular class of persons;" (2) "the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures;" and (3) "contemporary statements by decisionmakers on the record or in minutes of their meetings." *Id*. If the plaintiff satisfies this burden, the court will then determine whether the classification appropriately furthers a legitimate governmental purpose. *Id*. at 819-20. If the state action "impinge[s] on personal rights protected by the Constitution," it is subject to strict scrutiny. *City of Cleburne. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

Grace is likely to succeed on its claim that NC State has targeted Grace's members' speech based on Grace's Christian message. As explained above, NC State has used its Policy to target Grace members. *See* Part I.A.3. NC State thus has demonstrated a "'consistent pattern' of actions … disparately impacting members of" Grace based on their decision to speak about their Christian faith. *Sylvia Dev.*, 48 F.3d at 819. And the school's crackdown marks a "significant departure[] from normal procedures," which was to simply allow the thousands of students on campus to have conversations with each other without government supervision. *Id*. Finally, NC State's recent decision to strip CCM members of privileges that they have enjoyed for decades precisely because the organization had too many Christian members strongly suggests that the

school was particularly interested in silencing Grace members because of the Christian content of their message. And because NC State's discriminatory enforcement of the Policy is based on Grace members' First Amendment rights of free speech and free exercise, the school's action "constitutes an invidious discrimination" that denies Grace members "equal protection of the laws." *Shapiro v. Thompson*, 394 U.S. 618, 627 (1969). The Court, therefore, should grant Grace its requested injunctive relief.

## II. Grace will be irreparably harmed absent immediate relief.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520-21 (4th Cir. 2002) (same). NC State has made it unmistakably clear that Grace members cannot engage in speech on campus without the school's prior approval—an approval that can be withheld for any amount of time and for nebulous reasons that give school administrators carte blanche to reject viewpoints they dislike. And any sort of spontaneous speech in public—even a casual conversation or invitation to church—carries the substantial risk of University sanction. Thus, each day the Policy remains in place, Grace members are being denied the most basic First Amendment protections and are suffering irreparable harm that requires immediate relief from this Court.

## III. Immediately allowing Grace students to speak about their faith will not harm or disrupt NC State.

"[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola*, 303 F.3d at 521 (quotation marks omitted). This principle squarely applies here. NC State will suffer no harm if Grace members are allowed to talk—with or without a permit—to other students about their religious faith or

invite them to a Bible study or church service. And to the extent there are any costs to NC State, they are simply the costs of living in a free society. *See Boos v. Barry*, 485 U.S. 312, 322 (1988); *NAACP v. Claiborne Hardware Co*., 458 U.S. 886, 910 (1982).

## IV.    Upholding Grace's constitutional rights will serve the public interest.

Finally, there is no question that "upholding constitutional rights surely serves the public interest." *Giovani Carandola*, 303 F.3d at 521; *see also Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979) (recognizing the public's distinct interest in having a defendant's case heard by a jury). In this case, the public interest will be served best by eliminating NC State's sweeping requirement that any student obtain a speech permit before engaging in almost any type of speech anywhere on campus. In contrast, leaving the speech permit requirement in place "risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Rosenberger*, 515 U.S. at 836; *see also Auburn Alliance for Peace & Justice v. Martin*, 684 F. Supp. 1072, 1076 (M.D. Ala. 1988) ("[T]his court can think of no place that should be more hospitable to the free expression of ideas than the campus of a great university."). The Court, therefore, should grant Grace's motion for a preliminary injunction, which will remove draconian restrictions on the marketplace of ideas at NC State; allow Grace members to share their most deeply held beliefs; and protect the critical values of free speech, public discourse, and open intellectual inquiry on campus.

## CONCLUSION

Grace respectfully requests immediate relief in the form of a preliminary injunction. Respectfully submitted this 26th day of April, 2016,

By: /s/ Edmund G. LaCour Jr.

EDMUND G. LACOUR JR.
District of Columbia Bar No. 1030165
**BANCROFT PLLC**
500 New Jersey Avenue, 7th Floor
Washington D.C. 20001
202-234-0090
202-234-2806 FAX
elacour@bancroftpllc.com


DAVID A. CORTMAN
Georgia Bar No. 188810
TRAVIS C. BARHAM
Georgia Bar No. 753251
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
dcortman@adflegal.org
tbarham@adflegal.org


DAVID J. HACKER
California Bar No. 249272
**ALLIANCE DEFENDING FREEDOM**
101 Parkshore Drive, Suite 100
Folsom, California 95630
(916) 932-2850
(916) 932-2851 Fax
dhacker@adflegal.org


TYSON C. LANGHOFER
Arizona Bar No. 032589
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th St.
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
tlanghofer@adflegal.org

CHRISTIAN E. DYSART
Bar No. 36734
**DYSART LAW**
507 N. Blount St.
Raleigh, North Carolina 27604
(919) 747-8380
(919) 882-1222
Christian@cedysart.com
Local Civil Rule 83.1 Counsel for Plaintiff

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of April, 2016, I caused the foregoing paper

to be served upon all defendants along with the complaint and summons, pursuant to Fed.

R. Civ. P. 5(b).


s/Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Attorney for Plaintiff*