**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Civil Action No. 5:16-CV-202-D**

| | |
|---|---|
| **GRACE CHRISTIAN LIFE,** a registered student organization at North Carolina State University, <br><br> **Plaintiff,** <br><br> **v.** <br><br> **W. RANDOLPH WOODSON,** Chancellor of North Carolina State University, in his official and individual capacities, **WARWICK A. ARDEN,** Provost and Executive Vice Chancellor, in his official and individual capacities, **TJ WILLIS,** Associate Director of University Student Centers, in his official and individual capacities, **MIKE GIANCOLA,** Associate Provost, in his official and individual capacities, <br><br> **Defendants.** | **DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiff seeks to challenge a requirement by North Carolina State University ("NC State" or the "University") that persons who wish to solicit or distribute literature on campus apply for a permit. This requirement applies to anyone who wishes to engage in these activities, regardless of content or viewpoint. Plaintiff maintains that this has somehow stifled its speech. However, Plaintiff has regularly sought and successfully obtained multiple permits allowing its members to speak and distribute literature on NC State's campus. Plaintiff holds its weekly worship services and meetings on NC State's campus at the Talley Student Center and regularly engages in speech activities on campus. Plaintiff and its representatives have been granted hundreds of permits for its speech activities both within the past year and already for the upcoming academic year.

Under these circumstances, there is no risk of irreparable harm to Plaintiff, and Plaintiff cannot show a likelihood of success on the merits. Thus, a preliminary injunction should be denied.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff has moved for a preliminary injunction to prevent implementation of challenged provisions of the regulation. To prevail on that motion, Plaintiff must demonstrate: "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (internal quotation marks omitted).

## BACKGROUND

Defendants are officers or employees of North Carolina State University ("NC State"), a public institution. NC State has many outdoor and indoor spaces available to student groups and other persons for speech activities. Plaintiff is one of more than 600 registered student groups. (Felder Aff. ¶ 12) Sixty of the student groups at NC State are religious in nature, including nineteen Christian-affiliated groups. (*Id.*)

In May 2015, NC State opened a new student center, the "Talley Student Union" - a beautiful facility with spaces and venues for students, faculty, staff and the Wolfpack community to gather. (Hogan Aff. ¶ 3) Students come to Talley to dine, meet, socialize, attend meetings and programs, and study, among other things. (*Id.*) Student groups like Plaintiff may reserve space in Talley for meetings, and they also may reserve a table in the open area on the 1st floor of Talley if they wish to interact with or engage students who are passing through. (*Id.* ¶ 4) Talley

has 285,000 square feet and sees approximately 15,000 visitors per day. (*Id.* ¶ 3) Many of Plaintiff's allegations center around its activities in Talley.

Even though NC State is a public university that is accessible by the public, NC State retains the right to set reasonable limitations, consistent with free speech laws, on the time, place and manner of activities on University property in order to ensure its educational mission can be conducted and to maintain a safe and secure campus. Thus, the University has a policy relating to commercial and non-commercial solicitation of students on University premises. (Ex. 1)

NC State's solicitation policy, REG07.25.12 (Ex. 1, "Solicitation Regulation" or "Sol. Reg."), defines "non-commercial solicitation" as follows:

> any distribution of leaflets, brochures or other written material, or oral speech to a passersby,[1] conducted without intent to obtain commercial or private pecuniary gain. This definition does not include the dissemination of information for purposes of the administrative, academic, research, or extension activities of the University.

(Ex. 1, Sol. Reg. § 2.4) Student groups or individuals who wish to conduct solicitation on University premises must have written permission of Student Involvement. (*Id.* § 3.1) Moreover, if solicitation is to be conducted in a University facility, the administrator responsible for scheduling use of the facility must grant approval and the group must sign a facility use agreement. (*Id.* §§ 3.1, 5.2.4)[2]

Solicitation is subject to very few restrictions at NC State. While the regulation notes that the University may bar solicitation in campus areas that are not designated public forums,

---

[1]   The article "a" in this sentence appears to be a typographical error that is inconsistent with the plural noun "passersby" that follows.

[2]   During the relevant time frame, a group was considered approved for solicitation at a table in Talley if it submitted a request for a table reservation in Talley and was not required to submit a separate request to Student Involvement. (Hogan Aff. ¶ 10)

including areas not traditionally open to the public for speech, like office space, residence halls, and classrooms, (*id.* § 7.2), the available venues for solicitation by student groups are very broad. Under the regulation, solicitation is not permitted at University sponsored or hosted events at a handful of locations, including Carter-Finley Stadium, the PNC Arena and their parking lots. (*Id.* § 3.1)  However, non-commercial printed materials may be distributed to "passersby in ***any*** open exterior campus space."  (*Id.* § 5.2.3 (emphasis added))  Interior campus spaces are also available for student groups who wish to solicit.  (Felder Aff. ¶ 3)  Thus, the University's 600 registered student groups can and do reserve outdoor and indoor space and receive permission to solicit at multiple venues all over campus. (*Id.* ¶ 13)  Solicitation by student groups generally is allowed even in areas of student housing, with certain limitations (*e.g.*, no "door to door" solicitation).  (Ex. 1, Sol. Reg. § 4.1)  All solicitation simply must be conducted so that campus pedestrians and automobile traffic are unobstructed and members of the University community "may proceed with their normal activities."  (*Id.* § 5.2.1)

Within the Talley Student Union, student groups have available options for conducting speech activities and connecting with students.  First, student groups may reserve meeting space in Talley.  (Hogan Aff. ¶ 4)  Plaintiff has routinely availed itself of this opportunity and meets weekly for worship services within Talley.  (*Id.* ¶ 11 & Ex. 3)  Second, student groups may solicit passersby by reserving a table placed in a central location on the first floor within Talley – a prime location that has significant traffic flow.  (*Id.* ¶ 4)  In order to allow ingress and egress of the large number of visitors and minimize disruption and interference to other activities in Talley, all members of groups reserving tables at Talley are asked to stay near their tables.  (*Id.* ¶ 5)  During the 2015-16 school year, there were more than 600 requests from 140 different groups for the use of lobby tables in Talley.  (*Id.* ¶ 6)

Permission to solicit is routinely granted. (Felder Aff. ¶ 10) For Talley specifically, there are multiple ways to obtain a reservation, including in person, by telephone, by email and online. (Hogan Aff. ¶ 7) Reservations are accepted for meetings and lobby tables so long as space is available. (*Id.* ¶ 8) Reservations are routinely accepted from all types of groups. (*Id.* ¶ 13 & Ex. 4 (list of Talley reservations)) Plaintiff has regularly utilized space in Talley for various types of events, including worship services, information tables, speakers and meetings. (Hogan Aff. ¶ 12 & Exs. 2 & 3 (lists of Talley lobby table reservations and Plaintiff's Talley reservations)) Currently, Plaintiff already has sixty-three confirmed reservations for upcoming activities in Talley. (*Id.*)

The solicitation regulation contains no penalty for its violation, except as it relates to distribution of printed material for ***commercial*** purposes – an activity not at issue here.[3] Moreover, NC State's Code of Student Conduct, relating to student discipline, specifically acknowledges the right to free speech subject only to reasonable time, place and manner restrictions: "NC State embraces and strives to uphold the freedoms of expression and speech guaranteed by the First Amendment of the U.S. Constitution and the North Carolina Constitution." (Dkt. 1-6, Reg. 11-35-01 p. 2) The Code specifically warns that "[c]are must be exercised in order to preserve freedoms of speech and expression, as articulated in current legal standards." (*Id.* at §10.11) In at least the past ten academic years, no student or student group has been disciplined under the Code for failing to have a permit or violating the solicitation regulation. (Cousins Aff. ¶ 3)

---

[3] The policy notes that distribution of written materials for ***commercial*** purposes must comply in all respects with a particular section of the policy and that violations "may result in a trespass order . . . ." (Sol. Reg. § 5.2.3(d))

# I.     PLAINTIFF CANNOT SHOW A LIKELIHOOD OF IRREPARABLE HARM.

Plaintiff's request for preliminary injunction must fail, because Plaintiff cannot meet the first element of the test – a likelihood of irreparable harm.  Plaintiff cannot show that it will suffer any irreparable harm if NC State's Solicitation Policy remains in place pending a determination on the merits.

This is not a case where Plaintiff's members have been denied the opportunity to speak or have been threatened with suppression of their speech.  Plaintiff has gone through the permitting process many times and has repeatedly been granted permits to engage in speech activities; it has never had a request denied based on content or viewpoint.  (*See* Hogan Aff. ¶¶ 9 & 11 & Exs. 2-4)  Plaintiff has used space in Talley more than 190 times for various purposes through the permitting process this academic year.  (*Id.*)  Thus, Plaintiff has been permitted to "accomplish its mission" as it says it seeks to do, "through Bible studies, weekend worship services, small groups, on-on-one discussions, and other activities."  (Dkt 1, Compl. ¶ 18)  Plaintiff has been allowed to speak "through a variety of means including flyers, signs, hosting tables with information, worship services, small group meetings, and talking with fellow students about religious ideas . . ." (*Id.* ¶ 19)  Plaintiff has been allowed to "engage in conversations with other students and hand out literature, both inside and outside of Talley Student Union." (*Id.* ¶ 113).

As shown in Plaintiff's complaint, Plaintiff's members have been able to engage in their speech activities on campus.  In the complaint, Plaintiff alleges that Defendant Mike Giancola attended a Chaplains' Cooperative Ministry (CCM) meeting (of which Plaintiff was a member)[4] and informed the group concerning the appropriate way to obtain space on campus for speech activities.  (*Id.* ¶ 94)  University counsel also provided guidance to Plaintiff concerning the

---

[4]  Plaintiff references a decision by the University to change the nature of its relationship with CCM but does not (and cannot) base its claims on that decision.

policy. (Dkt. 1, Compl. Ex. 9)  Subsequently, Plaintiff was able to "set up a table in Talley Student Union with the prior permission of the University."  (Dkt. 1, Compl. ¶¶ 100, 110) Plaintiff's social media further demonstrate it has been able to regularly engage in speech activities on campus. (Exs. 5-6)

Plaintiff has only alleged that NC State has asked it to comply with its solicitation regulation, including the requirement that it (along with all other groups) obtain permits prior to engaging in solicitation on campus.  Plaintiff's desire to avoid the permitting process and wander more freely within Talley is not an irreparable harm.  Even if going through the permitting process is less convenient or desirable, Plaintiff has sufficient alternative channels available for conducting speech activities and is extremely unlikely to suffer any irreparable harm by continued application of the policy at this time.

Plaintiff contends that *any* First Amendment-related restriction automatically establishes irreparable harm.  However, the cases they cite involve situations where the right to speak was "either threatened or in fact being impaired at the time relief was sought."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520-21 (4th Cir. 2002) (noting that, in *Giovani*, the plaintiff "faces the threat of a substantial fine and temporary suspension of its license on the basis of past conduct, and prospectively, the loss of valuable business opportunities").[5]

Plaintiff dramatically claims that it has had to curtail certain types of conversations "lest they risk Grace's status as a student organization and their own ability to continue attending NC State."  (Dkt 4-1 at 9)  But Plaintiff does not even allege that these outcomes have been

---

[5]  Plaintiff cites the portion of *Giovani* addressing preliminary injunctive relief.  Notably, the Fourth Circuit ultimately upheld the challenged provisions and held they were not facially vague or overbroad – terminating the injunctive relief.  *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1080-85 (4th Cir. 2006).

considered or suggested by anyone at NC State and does not explain how, under the regulation, they are even remotely likely to occur. Nor does Plaintiff explain how the possibility of a trespass for *commercial* solicitation is at stake in this case. As discussed further below, Plaintiff's members have a clear path for compliance with the regulation at issue that allows them to exercise their First Amendment rights.

## II. NC STATE IS ENTITLED TO A FULL AND FAIR REVIEW OF ITS POLICY, WHICH PROTECTS SIGNIFICANT INTERESTS.

NC State and its officers have significant and legitimate interests in the solicitation regulation continuing to be in effect while this lawsuit is resolved. Plaintiff admits that Defendants have an interest in maintaining a safe campus. (Dkt. 1, Compl. ¶ 151) The permitting requirements allow the University to control large gatherings that might disrupt classes and other University functions, block academic building access, or create traffic hazards, to arrange for security in advance where it may be needed, to protect students and property, to maintain a safe environment and to decrease the risk of crime on campus. (Felder Aff. ¶ 8) The regulation also prevents avoidable conflicts, helps the University maximize its resources, facility use and campus space, and ensures access is available to a diverse mix of groups. (*Id.*) The regulation aids the University in avoiding undue disruption to its primary functions – teaching, research and service. (*Id.*) The solicitation regulation also helps prevent exploitation of students. (*Id.*)

Courts have held that universities need to be able to ensure safety and security, prevent unlawful conduct, avoid disruption to educational activities and address competing interests even in public forums. *See, e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 268-69 (1981) (holding that a public university may "impose reasonable regulations compatible with [its educational] mission upon the use of its campus and facilities"); *Healy v. James*, 408 U.S. 169 (1972) ("[A] college

has a legitimate interest in preventing disruption on the campus"). As the Ninth Circuit recognized, "[n]ot only must a university have the power to foster an atmosphere and conditions in which its educational mission can be carried out, it also has a duty to protect its students by imposing reasonable regulations on the conduct of those who come onto campus." *Souders v. Lucero*, 196 F.3d 1040, 1045 (9th Cir. 1999). Moreover, as the Eleventh Circuit stated, "the University has a significant interest in regulating competing uses of [a free speech area] in order to ensure that diverse viewpoints are heard and that the University's community members – particularly the students – have ample access to scarce university facilities." *Bloedorn v. Grube*, 631 F.3d 1218, 1238 (11th Cir. 2011).

Here, the University's interests are legally recognized and substantial. Moreover, a temporary injunction that alters the University's long-term policy (adopted in 1993) (*see* Ex. 1), has the potential to create confusion and inconsistency. The University has a significant interest in continuing its regulation and an injunction should not be issued.

### III. PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS IN CHALLENGING NC STATE'S CONTENT NEUTRAL "TIME, PLACE, OR MANNER" POLICY.

Plaintiff has not shown that it is likely to succeed in challenging the policy either on its face or as applied.

#### A. PLAINTIFF LACKS STANDING TO CHALLENGE MOST ASPECTS OF THE POLICY.

"[S]tanding jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement . . . and prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004). Article III standing requires a plaintiff to show: (1) injury-in-fact; (2) a causal connection or traceability; and (3)

redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). The injury-in-fact criteria contemplates that the alleged injury-in-fact is both "concrete and particularized and actual or imminent." *Id*. at 560. The term "particularized" means that "the injury must affect the plaintiff in a personal and individual way." *Id*. at 560 n.1. In addition, "there must be a causal connection between the injury and the conduct complained of . . . ." *Id*. at 560. Stated differently, the injury must be "fairly traceable" to action by the defendant. *Id*. Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. at 561 (internal quotation marks omitted).

A regulation that burdens speech creates a justiciable injury if on its face it restricts expressive activity by the class to which the plaintiff belongs, or if its presence otherwise tends to chill the plaintiff's exercise of First Amendment rights. *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999). However, fears of enforcement that are "imaginary" or "wholly speculative" are insufficient to confer standing. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979).

To establish a plaintiff's standing under Article III, the challenged regulation must present a credible threat of enforcement against the party bringing suit. *N.C. Right to Life, Inc.*, 168 F.3d at 710. A plaintiff must establish such a threat with respect to ***each of the provisions*** it seeks to challenge, as standing regarding one aspect of a policy cannot be bootstrapped into standing as to the rest. *See Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429-30 (4th Cir. 2007); *Rock for Life-UMBC v. Hrabowski*, No. 09-1892, 411 F. App'x 541, 547 (4th Cir. Dec. 16, 2010) (unpublished decision attached). To demonstrate a credible threat that a policy is likely to be enforced in the future, the court may consider a history of threatened or actual enforcement of the policy against the plaintiff or other similarly-situated parties. *Hrabowski*,

411 F. App'x at 548 (holding that plaintiff group lacked standing to challenge sexual harassment policy because they could not show a credible threat of enforcement against the group). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm . . . ." *Id. at 549* (citing *Laird v. Tatum*, 408 U.S. 1, 13-14, 92 S. Ct. 2318, 33 L. Ed. 2d 154 (1972)).

Here, Plaintiff seeks to challenge many aspects of the policy that do not relate to Plaintiff's own activities. For instance, Plaintiff's permitting requests reflect that it regularly engages in systematic speech; it has not alleged that its members have a need for an exception for spontaneous speech due to news or current events. Moreover, Plaintiff has not asserted that its members require anonymity to share their message; thus, it cannot challenge the alleged lack of an exception for anonymous speech. Plaintiff also cannot challenge the trespass provision for commercial speech, because they have not engaged in, and have not expressed an intent to engage in, commercial speech. Nor can Plaintiff challenge the regulation's language about permitting for speech that is inconsistent with the mission of the University and particular locations, because that provision has not been applied to Plaintiff, been threatened to apply to Plaintiff or been applied to any similar groups or conduct. Nor can Plaintiff show, as to *any* of these provisions, a credible threat of future enforcement against Plaintiff.

Plaintiff has not even plausibly alleged a credible threat of discipline of any kind even for violating the regulation as to permitting or wandering from tables. By contrast, cases cited by Plaintiff, such as *ACLU v. Mote*, 423 F.3d 438, 441 (4th Cir. 2005), involved much more direct threats of enforcement. In *Mote*, for instance, university police issued the speaker a citation and ordered him to leave the campus or be arrested. Plaintiff's members have encountered no similar threats so Plaintiff lacks standing to challenge the enforcement.

Even if Plaintiff were determined to have standing for the aspects of the policy with which its members must comply to engage in their normal activities, at most, Plaintiff could only seek to challenge the requirement for 1) a permit to engage in non-commercial solicitation on campus and 2) the policy of requiring solicitors to stay near their tables in Talley. As discussed below, Plaintiff is unlikely to prevail on the merits of such claims.

**B.     PLAINTIFF IS NOT LIKELY TO PREVAIL ON ITS FREE SPEECH CLAIM.**

"It is well settled that the First Amendment protection of speech and assembly is not absolute." *Occupy Ft. Myers v. City of Ft. Myers*, 882 F. Supp. 2d 1320, 1326 (M.D. Fla. 2011). As the United States Supreme Court has recognized, "[e]ven protected speech is not equally permissible in all places and at all times." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985). Indeed, there is nothing in the Constitution that requires the State to grant access to all its property to everyone wishing to exercise the right to free speech. *Id.*; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46 (1983) ("[T]he 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.'") (quoting *U.S. Postal Serv. v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 129 (1981)).

When a plaintiff asserts a First Amendment claim, courts must first determine "whether the plaintiff has engaged in protected speech." *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003) (citation omitted). Next, the court "must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Mote*, 423 F.3d at 442-43 (citing *Goulart,* 345 F.3d at 246). After the court determines the type of forum, the court must determine if the justifications for the exclusion of the speech satisfy the requisite standard of review for that forum. *Id.* An "internal" standard

applies and the restriction is subject to strict scrutiny "if the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available . . ." *Warren v. Fairfax Cty.,* 196 F.3d 186, 193 (4th Cir. 1999); *Mote*, 423 F.3d at 444.

For purposes of this motion, Defendants do not dispute that Plaintiff has engaged in protected speech. Concerning the nature of the forum, while many areas of the University are open to the public, universities differ in significant respects from traditional public forums. *Widmar*, 454 U.S. at 267 n.5. Indeed, universities are institutes of higher learning devoted to educating their students. *Mote*, 423 F.3d at 444. Their mission focuses on students and other members of the university community. *Id.* For that reason, they do not have to "make all of [their] facilities equally available to students and nonstudents, alike," nor do they have to grant free access to all of their facilities. *Widmar*, 454 U.S. at 267 n.5.

Even assuming for purposes of this motion that the areas at issue (the public areas inside and outside Talley) would be treated as a public forum or designated limited public forum with respect to use by a recognized student group,[6] Plaintiff cannot show a likelihood of success on the merits.

As discussed above, universities need to be able to ensure safety, security and order, prevent unlawful conduct, ensure access to various groups, and carry on their educational missions, even in public forums while balancing the right to freedom of speech. Thus, access to traditional public fora may be limited "by content-neutral and reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for

---

[6]  It is not obvious that this is the appropriate standard, as to Plaintiff, because its own allegations demonstrate that an external class of speakers (non-students) are among the persons engaging in speech activities. For instance, one of the speakers at issue is Thommy Saunders, who is a pastor at Grace Christian and not a currently enrolled student at NC State. (Dkt. 1, Compl. ¶ 85)

communication of the information." *Warren,* 196 F.3d at 192 (quotation marks omitted). Here, NC State's solicitation regulation meets this requirement.

### 1. The Regulation Is A Content-Neutral And Reasonable Time, Place And Manner Restriction.

Despite Plaintiff's attempts to characterize the regulation as viewpoint discrimination, the solicitation regulation is content neutral in that it applies to all forms of solicitation – the definition of which has nothing to do with viewpoint of any kind. (*See* Ex. 1, Sol. Reg. § 3.1) The regulation is a reasonable time, place or manner restriction that allows the University to take necessary safety and security measures, control large gatherings that might disrupt classes and other University functions, block academic building access, create traffic hazards, and avoid conflicts between groups and disruption to University activities. (*See* Felder Aff. ¶¶ 7-8) Similarly, the Talley table requirement has nothing to do with content or viewpoint and is a simple manner restriction designed to allow ingress and egress in a busy area. (*See Hogan* Aff. ¶ 9) These provisions only determine time and location for speech activities and do not prevent any speech based on its content or viewpoint.

### 2. The Regulation Is Narrowly Tailored To Serve A Significant Government Interest.

As discussed above, the regulation serves significant government interests related to safety and security, protection of property of students, preventing disruption to the University's educational activities, and allocation of space. Plaintiff claims that the regulation is not narrowly tailored to serve the University's interests. But Plaintiff cannot forecast a likelihood of success on this issue. Narrowly tailored regulation of speech "need not be the least restrictive or least intrusive means of" effectuating the government's interests, *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989), but it may not "burden substantially more speech than is necessary to

further [those] . . . interests." *Id.* at 799. The government need only avoid "regulat[ing] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id*. at 799.

Plaintiff claims that the regulation burdens substantially more speech than necessary. But the solicitation regulation by definition only applies to the commercial or non-commercial solicitation of passersby – not all communications or conversations between members of the campus community, as Plaintiff misleadingly suggests. In fact, the solicitation regulation does not apply to the University's administrative, academic, research or extension activities. Moreover, the regulation imposes only the minimal burden of obtaining a permit.

Plaintiff cites *Cox v. Charleston,* 416 F.3d 281, 286 (4th Cir. 2005), in which the Fourth Circuit addressed a city's permitting requirement for the streets and determined it was overbroad where it applied to a small meeting of individuals who would not necessarily disrupt flow of sidewalk traffic. However, as discussed above, University campus space is very different from a city street. Moreover, the city's permitting requirement was more burdensome than NC State's in that it required three days advance notice and made noncompliance a misdemeanor. Thus, the decision in *Cox* is distinguishable.

Plaintiff next claims that the regulation does not contain sufficient standards for denial and affords too much discretion to administrators to disallow speech. However, the regulation itself is clear that that permits will be granted subject only to time, place and manner restrictions. (Ex. 1, Sol. Reg. § 3.3) The regulation provides administrators with little discretion over permitting. (*Id.* ("Permission from the Student Involvement ***will be granted***, subject to reasonable time, place or manner limits." (emphasis added)) Moreover, although the regulation states that permission may be limited to solicitation that is consistent with the University's

mission and purpose of the location, this means only that solicitation may be limited by reasonable time, place and manner restrictions to avoid disruption to the University's educational activities.[7] (Felder Aff. ¶ 9) Thus, permits are never denied based on viewpoint. (*Id.* ¶ 10) Moreover, allowing minimal discretion for administrators to work with groups to determine locations and times that are a good fit for an activity is less burdensome than hard and fast rules, which would risk being overbroad and unnecessarily restrictive. *See Schleifer v. City of Charlottesville*, 159 F.3d 843, 854 (4th Cir. 1998) ("the mere possibility that such discretion might be abused hardly entitles courts to strike a law down").

Plaintiff further complains that the regulation has been employed in a discriminatory manner. However, the "examples" in Plaintiff's complaint of groups allegedly failing to obtain permits for their activities are vague and do not establish undue differential treatment. (Dkt. 1, Compl. ¶¶ 105-109) Even as alleged, there are plausible reasons for differences, including that the activities of other groups were part of the University's academic activities or did not come to administrators' attention. Plaintiff cannot demonstrate a likelihood of success for selected targeting based on these alleged facts.

Plaintiff next complains that the regulation itself does not contain a time frame for the issuance of permits. In practice, however, this is a non-issue. (Felder Aff. ¶ 11; Hogan Aff. ¶ 7) *See Bloedorn* (considering how a regulation was implemented, in practice). In any event, a speech regulation does not need time limitations on decision making to be constitutional where,

---

[7] Plaintiff claims this is indistinguishable from an ordinance struck down in *Shuttlesworth v. City of Birmingham,* 394 U.S. 147 (1969). However, that case is highly distinguishable from this one. In that case, a Birmingham ordinance was used to convict an African-American minister leading church members in a peaceful civil rights protest and sentence him to hard labor. Unlike the current regulation, the Birmingham ordinance was applied to prohibit a certain type of speech and was not a time, place or manner restriction.

as here, it is content-neutral. *Covenant Media of S.C., LLC*, 493 F.3d at 435. Plaintiff's complaint contains no allegation that it did not timely receive a permit for any of its activities.

In short, despite attempts to mischaracterize the regulation, it serves merely as a time, place and manner restriction that reasonably allows speech of all kinds on campus with little administrative burden. Similar permitting requirements have been upheld. In *Bowman v. White*, 444 F.3d 967 (8th Cir. 2006), for instance the Eighth Circuit upheld the university's requirement that a non-university entity obtain a permit before using an outdoor common area on campus (and a ban on the use of outdoor common areas during certain time periods) and determined that this requirement did not violate free speech guarantees. In *Bloedorn*, the Eleventh Circuit held that a preacher was not likely to show his free speech rights were violated when he was required to obtain a permit before being allowed to use an area designated for public speakers because the policy was content-neutral on its face and all speakers were governed by the same standards regarding the length of time and frequency for which the permit would be granted. There, the Court looked at permitting practices, not just the policy's language, in determining that there was not "unbridled" discretion even though the policy allowed administrators to make determinations about time and location. In *Riemers v. State ex rel. University of North Dakota*, 2009 ND 115, 767 N.W.2d 832, 246 Ed. Law Rep. 408 (N.D. 2009), the North Dakota Supreme Court rejected a free speech challenge against the state university and held that the university policy, which required that persons wishing to engage in on-campus petitioning complete a special events form, was a reasonable time, place, and manner restriction on expressive activities. *See also Alabama Student Party v. Student Government Ass'n of the University of Alabama*, 867 F.2d 1344 (11th Cir. 1989) (holding that school regulations, which restricted the distribution of campus literature only at a residence or outside of the campus buildings, were reasonably related

to the university's legitimate interest in minimizing the disruptive effect of campus electioneering).

In short, NC State's permitting requirements and processes are narrowly tailored to serve significant University interests.

### 3. The Solicitation Regulation Leaves Open Ample Alternatives For Communication.

NC State's regulation leaves open ample alternative channels of communication. As an initial manner, the regulation allows individuals and groups opportunities for communication all over campus by merely obtaining a permit. As described above, solicitation may be done in Talley through the table reservation process. In addition, solicitation can be done at various other buildings as well as at exterior locations; these exterior locations do not require the solicitor to stay near a table and the solicitor would have the ability to approach students as they wish. Moreover, to the extent the issue is the permitting process in general, there are many off-campus locations where student groups and others can (and do) solicit students. Thus, the regulation provides ample means for communication.

### C. PLAINTIFF IS NOT LIKELY TO PREVAIL ON ITS DUE PROCESS CLAIM.

Plaintiff next claims that the regulation violates the due process clause because it is vague and overbroad. The courts have repeatedly emphasized that an overbreadth claimant bears the burden of demonstrating, "from the text of [the regulation] and *from actual fact*" that substantial overbreadth exists. *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (emphasis added). Similarly, "there must be a realistic danger that the [regulation] itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Members of City Council of Los Angeles v. Taxpayers for*

*Vincen*t, 466 U.S. 789, 801 (1984). Moreover, a law is not void for vagueness so long as it "(1) establishes 'minimal guidelines to govern law enforcement,' and (2) gives reasonable notice of the proscribed conduct." *Schleifer*, 159 F.3d at 853. The Constitution allows greater tolerance for imprecision in where no criminal penalty is at stake. *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498-99 (1982).

As discussed above, the regulation focuses on solicitation and is neither overbroad nor vague. The regulation contains a clear path to compliance, because any person or group who wishes to engage in solicitation on NC State's campus not for academic, research, administrative, or extension purposes must obtain a permit through a straightforward, well-publicized process. (Felder Aff. ¶ 6) In *Bloedorn*, the Eleventh Circuit held that a permitting policy did not employ vague or undefined standards where the practice was to issue any permit after a speaker requested a time and date so long as the space had not already been reserved and all speakers were governed by the same standard. 631 F.3d at 1238. Here as well, a permit will be issued subject only to resolving date, time, and location issues.

The solicitation regulation contains no penalties (criminal or otherwise) for non-compliance as it relates to Plaintiff's non-commercial solicitation. Thus, a due process challenge to the regulation is not likely to succeed.

### D. PLAINTIFF IS NOT LIKELY TO SUCCEED ON ITS EQUAL PROTECTION CLAIM.

To succeed on an equal protection claim, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Veney v. Wyche*, 293 F.3d 726, 730-31 (4th Cir. 2002). If the Plaintiff makes this showing, "the court proceeds to

determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*

Plaintiff cannot succeed on this claim, because it cannot show that it was treated differently than a similarly situated group. As discussed above, Plaintiff has not pled any factual allegations that plausibly show it was similarly situated to other groups and treated differently as required by the pleading standards the United States Supreme Court articulated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]. Furthermore, Plaintiff has not alleged facts that could plausibly show that Plaintiff was treated differently from other groups based on religion (or speech). Allegations to that effect are conclusions the Court would not be required to accept.

At bottom, the regulation is content and viewpoint neutral and equally applicable to any group that wishes to engage in soliciting on campus. Indeed, religious groups of all types regularly receive permits and use space at the University. (*See* Hogan Aff. ¶ 4; Felder Aff. ¶¶ 12-13; Ex. 4) Thus, Plaintiff is not likely to prevail on this claim.

## E.  PLAINTIFF IS NOT LIKELY TO PREVAIL ON ITS FREE EXERCISE CLAIM.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. Amend. I. The clause forbids government from adopting laws designed to suppress religious belief or practice. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993). However, a neutral, generally applicable law does not offend the Free Exercise Clause, even if the law has an incidental effect on religious practice. *Am. Life League v. Reno*, 47 F.3d 642, 654 (4th Cir. 1995). Here, Plaintiff has not alleged that the permitting requirement was designed to suppress religious belief, much less that it does so. Plaintiff's free exercise claim is without merit.

## IV.  IT IS IN THE PUBLIC INTEREST TO ALLOW THIS ISSUE TO BE DECIDED ON THE MERITS.

NC State, as a public university, serves the State of North Carolina and the public.

N.C.G.S. § 116-1(b), "Purpose," provides, in relevant part:

> The University of North Carolina is a public, multicampus university dedicated to the service of North Carolina and its people. It encompasses the 16 diverse constituent institutions . . . . Each shares in the overall mission of the university. That mission is to discover, create, transmit, and apply knowledge to address the needs of individuals and society.  This mission is accomplished through instruction, which communicates the knowledge and values and imparts the skills necessary for individuals to lead responsible, productive, and personally satisfying lives; through research, scholarship, and creative activities, which advance knowledge and enhance the educational process; and through public service, which contributes to the solution of societal problems and enriches the quality of life in the State. In the fulfillment of this mission, the university shall seek an efficient use of available resources to ensure the highest quality in its service to the citizens of the State.

It is in the public interest that the University succeed in its educational mission.  It is also in the public interest for longstanding University policies to be enacted through deliberation and debate, not at a preliminary stage of litigation, and for a full and fair resolution of any disputes. Thus, the public interest weighs against an injunction.

## CONCLUSION

This is not a case that should have led to the filing of a lawsuit.  NC State is committed to free speech and compliance with the First Amendment.  The University is open to dialogue with Plaintiff and other student groups and is continuously seeking ways to improve its policies and their implementation.  The University has expressed to Plaintiff that it will consider in good faith proposed changes to the policy to see if any can be implemented consistent with the University's interests.  In the meantime, Plaintiff is welcome to continue to utilize NC State's space and

facilities, as it has done this past year, for its activities and to reach NC State's students.  For the foregoing reasons, Plaintiff's request for preliminary injunction should be denied.

This the 23rd day of May 2016.

ROY COOPER
Attorney General

/s/ Stephanie A. Brennan
Stephanie A. Brennan
Special Deputy Attorney General
NC State Bar No. 35955
sbrennan@ncdoj.gov

/s/Kimberly D. Potter
Special Deputy Attorney General
NC State Bar No. 24314
kpotter@ncdoj.gov

NC Department of Justice
PO Box 629
Raleigh, NC  27602-0629
Tel: 919.716.6920
Fax: 919.716.6764

*Attorneys for Defendants*

facilities, as it has done this past year, for its activities and to reach NC State's students.  For the foregoing reasons, Plaintiff's request for preliminary injunction should be denied.

This the 23rd day of May 2016.

ROY COOPER
Attorney General

/s/ Stephanie A. Brennan
Stephanie A. Brennan
Special Deputy Attorney General
NC State Bar No. 35955
sbrennan@ncdoj.gov

/s/Kimberly D. Potter
Special Deputy Attorney General
NC State Bar No. 24314
kpotter@ncdoj.gov

NC Department of Justice
PO Box 629
Raleigh, NC  27602-0629
Tel: 919.716.6920
Fax: 919.716.6764

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I certify that the foregoing **DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION** was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to the below listed attorneys for Plaintiff, as follows:

> Edmund G. LaCour, Jr., elacour@bancroftpllc.com
> Christian E. Dysart, christian@cedysart.com
> Tyson Langhofer, tlanghofer@adflegal.org
> David Hacker, dhacker@adflegal.org
> Travis Barham, tbarham@adflegal.org

This the 23rd day of May 2016.


/s/ Stephanie A. Brennan
Stephanie A. Brennan
Special Deputy Attorney General