**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| **GRACE CHRISTIAN LIFE**, a registered student organization at North Carolina State University,<br><br>*Plaintiff*,<br><br>v.<br><br>**WILLIAM R. WOODSON**, Chancellor of North Carolina State University, in his official and individual capacities; **WARWICK A. ARDEN**, Provost and Executive Vice Chancellor, in his official and individual capacities; **TJ WILLIS**, Associate Director of University Student Centers, in his official and individual capacities; **MIKE GIANCOLA**, Associate Provost, in his official and individual capacities,<br><br>*Defendants*. | Case No. 5:16-cv-00202 |

# PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

ARGUMENT .......... 1

I. Grace is likely to prevail in its challenge of NC State's selectively enforced prior restraint on student speech .......... 1

A. Grace has established standing to challenge NC State's Speech Permit Policy. .......... 1

B. NC State's speech permit requirement violates the Free Speech Clause of the First Amendment. .......... 3

C. NC State has used the Policy to discriminate against Grace. .......... 8

II. Grace will continue to be irreparably harmed absent immediate relief .......... 9

III. Allowing Grace students to speak about their faith will not harm NC State .......... 10

IV. Protecting First Amendment rights at NC State will promote the public interest .......... 10

CONCLUSION .......... 10

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

**Cases**

*11126 Baltimore Blvd., Inc. v. Prince George's Cty.*,
58 F.3d 988 (4th Cir. 1995) .................... 4

*ACLU of Va., Inc. v. Radford Coll.*,
315 F. Supp. 893 (W.D. Va. 1970) .................... 5

*Ala. Student Party v. Student Gov't Ass'n of the Univ. of Ala.*,
867 F.2d 1344 (11th Cir. 1989) .................... 7, 8

*Bloedorn v. Grube*,
631 F.3d 1218 (11th Cir. 2011) .................... 7

*Bowman v. White*,
444 F.3d 967 (8th Cir. 2006) .................... 7

*Centro Tepeyac v. Montgomery Cty.*,
722 F.3d 184 (4th Cir. 2013) .................... 9

*Cox v. City of Charleston*,
416 F.3d 281 (4th Cir. 2005) .................... 3, 6

*Forsyth Cty. v. Nationalist Movement*,
505 U.S. 123 (1992) .................... 7

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .................... 1

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) .................... 10

*Healy v. James*,
408 U.S. 169 (1972) .................... 6

*Knowles v. City of Waco*,
462 F.3d 430 (5th Cir. 2006) .................... 5

*Long Beach Area Peace Network v. City of Long Beach*,
574 F.3d 1011 (9th Cir. 2008) .................... 8

*N.C. Right to Life, Inc. v. Bartlett*,
168 F.3d 705 (4th Cir. 1999) .................... 2

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) .................... 4

*Niemotko v. Maryland*,
340 U.S. 268 (1951).......... 4

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009).......... 5

*Riemers v. State ex rel. Univ. of N.D.*,
767 N.W.2d 832 (N.D. 2009).......... 7

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995).......... 10

*Schneider v. State*,
308 U.S. 147 (1939).......... 8

*Thomas v. Chicago Park Dist.*,
534 U.S. 316 (2002).......... 4

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989).......... 5

*Widmar v. Vincent*,
454 U.S. 263 (1981).......... 1, 7

## INTRODUCTION

North Carolina State University ("NC State") enforces a staggeringly broad prior restraint on speech that requires any student to obtain a speech permit from the school before distributing any written material or engaging in "oral speech to … passersby" anywhere on campus. Dkt.4-6, Policy §§ 2.4, 3.1. Even worse, the Policy grants school administrators unfettered discretion to determine which students will receive speech permits and allows administrators to deny requests if the proposed content is not "consistent with the University's mission." *Id*. § 3.3. Defendants have used the Policy to silence members of Grace Christian Life ("Grace"), an NC State student group, for doing nothing more than telling students about Grace events and engaging them in cordial, impromptu conversations about religion. If the State of North Carolina imposed a similar law statewide, the First Amendment would operate to invalidate the law. Because "First Amendment rights of speech and association extend to" students on "the campuses of state universities" with equal force, *Widmar v. Vincent*, 454 U.S. 263, 268-69 (1981), NC State's Policy must be enjoined.

## ARGUMENT

### I. Grace is likely to prevail in its challenge of NC State's selectively enforced prior restraint on student speech.

#### A. Grace has established standing to challenge NC State's Speech Permit Policy.

To demonstrate standing, a plaintiff must establish that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000). A regulation "that facially restrict[s] expressive activity by the class to which the plaintiff

belongs presents … a credible threat" of enforcement sufficient to give rise to standing "in the absence of compelling evidence to the contrary." *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (quotation marks omitted). "This presumption is particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights." *Id*.

Grace has undoubtedly established standing to challenge the Policy. Defendants admit that the Policy applies to Grace members' "normal activities," Dkt. 25, Resp. 12, and Defendants do not dispute Grace's assertions that its members (1) desire to continue engaging in expressive activity, including spontaneous speech; and (2) that the Policy has chilled their expression. *See* Compl. ¶¶ 124-127, 168. Moreover, the Policy has *already* been enforced against Grace members on multiple occasions to deny them their constitutional rights. *See, e.g.*, *id*. at ¶¶ 85-88, 100-103. Grace, therefore, has established a "credible threat" of enforcement sufficient to establish an Article III case or controversy.

Nevertheless, Defendants assert that Grace does not have standing because it has not "plausibly alleged a credible threat of discipline of any kind … for violating the" Policy. Resp. 11. But, as noted, the Policy has already been enforced against Grace's members repeatedly, chilling their speech. And NC State's Code of Student Conduct makes clear that if Grace members continue to violate the Policy, they will be guilty of "non-academic misconduct" "that will be subject to disciplinary action," Dkt. 4-7, Policy 11.35.01 § 10.20, with sanctions ranging from a written warning to expulsion, *id.* at §§ 11.1-11.4. While no Grace member has yet been suspended or expelled, Defendants do not suggest that students are free to treat the Policy as a dead letter or disregard commands from administrators who order them to stop distributing written materials or speaking to passersby. Rather, with the force of the Policy behind them, NC State administrators have repeatedly demanded that Grace members comply with the Policy.

Defendants also miss the mark with their contention that Grace has impermissibly challenged "aspects of the policy that do not relate to Plaintiff's own activities." Resp. 11. While a plaintiff must establish standing as to each of the "*provisions*" of a statute it seeks to challenge, *id*. at 10, Grace has challenged only one provision—NC State's speech permit requirement. Grace notes that the Policy is overbroad because it prohibits both spontaneous and anonymous speech, which are "simple examples" that "illustrate the overbreadth of the" one provision. *Cox v. City of Charleston*, 416 F.3d 281, 286 (4th Cir. 2005).[1] And Grace's contention that the Policy allows content-based discrimination because permits can be denied if the proposed speech is inconsistent with the "University's mission" is part of Grace's facial challenge based on the administrators' unfettered discretion to silence unpopular viewpoints. In short, Grace has not challenged multiple "provisions," but rather one simple provision rife with constitutional infirmities.

**B. NC State's speech permit requirement violates the Free Speech Clause of the First Amendment.**

Defendants do not dispute that NC State's Policy forbids Grace's members from engaging in protected speech in public fora. Resp. 13. Instead, they contend that the standardless Policy is a "content-neutral and reasonable time, place and manner restriction," *id*. at 14; that this wide-ranging prior restraint is "narrowly tailored to serve a significant government interest," *id*.; and that the Policy "leaves open ample alternatives for communication," *id*. at 18, because students can either ask the school for permission before expressing themselves or exercise their rights off campus. Each of these arguments fails.

[1] In all events, Grace has plainly established that the Policy infringes on its members' right to engage in spontaneous speech. Defendants have silenced Grace members' spontaneous speech repeatedly, and the Policy continues to chill their speech. Compl. ¶¶ 18-20, 120, 124-127.

### 1. The standardless Policy is neither content-neutral nor a reasonable time, place, and manner restriction.

Defendants first assert that the Policy passes constitutional muster because it is merely a "content-neutral and reasonable time, place and manner restriction" on speech. Resp. 14. But as Grace explained in its opening Memorandum, merely stating the words "reasonable time, place, or manner" in the Policy does not make it a constitutionally permissible restriction. *See* Dkt. 4-1, Mem. 18-20. Instead, the Constitution "require[s] that a time, place, and manner regulation contain *adequate standards* to guide the official's decision and render it subject to effective judicial review." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002) (emphasis added). Here, the Policy lacks "specific standards to guide the decisionmaker in judging whether a license should issue." *11126 Baltimore Blvd., Inc. v. Prince George's Cty.*, 58 F.3d 988, 994 (4th Cir. 1995). Because the Policy lacks "narrowly drawn, reasonable and definite standards for the officials to follow," it "must be invalid." *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951).

Moreover, the Policy provides that, "[i]n addition, permission may be limited to solicitation that is consistent with the University's mission and purpose of the location." Policy § 3.3. This "mission" clause is an open-ended grant of authority to administrators, allowing them to evaluate the content of speech against the administrators' views of the University's undefined "mission." Defendants claim that this language "means only that solicitation may be limited by reasonable time, place and manner restrictions to avoid disruption to the University's educational activities." Resp. 16. But the Policy already states that speech can be limited by "reasonable time, place, or manner limits," Policy § 3.3, making Defendants' interpretation implausible. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007) ("we have cautioned against reading a text in a way that makes part of it redundant"). Instead, the Policy's "mission" clause is a second grant of unfettered discretion to University administrators, expressly allowing for viewpoint-based

discrimination. The clause thus renders the Policy unconstitutional. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009); *see also ACLU of Va., Inc. v. Radford Coll.*, 315 F. Supp. 893, 898 (W.D. Va. 1970) (concept of the "scope and objectives" of Radford College was "so vague that this court can only speculate on what the objectives of Radford might be").

**2. The Policy prohibits far more speech than is necessary to advance the University's interests.**

In addition to NC State's Policy not providing sufficient standards to cabin administrators' discretion, it is also unconstitutional because its capacious reach "burden[s] substantially more speech than is necessary to further the [University]'s legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). The Defendants' half-hearted attempts to argue otherwise only confirm that this expansive prior restraint cannot stand.

Defendants first contend that the Policy does not burden *that much* speech because it "only applies to the commercial or non-commercial solicitation of passersby—not all communications or conversations between members of the campus community," Resp. 15. But while the Policy—which applies to "any distribution of … written material[s], or oral speech to … passersby," Policy § 2.4—may not cover *every* communication on campus, it is certainly a strong start. All written communications must be school-sanctioned. And a plain reading of the Policy would prohibit any non-permitted "oral speech" so long as one of the interlocutors is "passing by." The scope of the Policy, therefore, is astounding. Tellingly, the University never tries to explain why the Policy must cover so much speech to advance its interests.

Any such attempt to justify the Policy's breadth would fail as courts have repeatedly held that "ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest." *Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006); *see also* Mem. 22-24. When the Fourth Circuit assessed a city ordinance that

required a permit before "any parade, meeting, exhibition, assembly or procession" could take place on city streets or sidewalks, the court struck it down because it applied even to "a small meeting of individuals who gather on the sidewalk … to hand out religious tracts …, even if their expression does nothing to disturb or disrupt the flow of sidewalk traffic." *Cox v. City of Charleston*, 416 F.3d 281, 286 (4th Cir. 2005). As further evidence of the ordinance's overbreadth, the court noted that "[s]pontaneous expression, which is often the most effective kind of expression, is prohibited by the [O]rdinance." *Id*.

The court's decision in *Cox* controls this case, as any NC State student handing out written materials or engaging in oral speech to passersby—"no matter how innocuous—is in violation of the [Policy] unless the [student or] group first obtains a permit from the [University] administrator." *Id*. In response, Defendants assert that *Cox* is inapposite because "University campus space is very different from a city street." Resp. 15. But the Supreme Court has left "no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972). And Defendants do not explain what makes city sidewalks so "very different" from University sidewalks that a lone college student must obtain prior permission for speech on campus but not for the same speech in downtown Raleigh.

Defendants next argue that *Cox* is distinguishable because the permitting requirement there "required three days advance notice and made noncompliance a misdemeanor." Resp. 15. But NC State's prior restraint still prohibits spontaneous speech.[2] And an unconstitutional penalty on speech cannot be rendered constitutional by merely reducing the penalty. NC State's restriction

[2] Defendants are thus incorrect when they assert that the Policy "reasonably allows speech of all kinds on campus with little administrative burden." Resp. 17. Under the Policy, neither spontaneous nor anonymous speech are allowed. *See* Mem. 21-22.

on small groups of students—like the ordinance in *Cox*—is "invalid because it [i]s unrelated to any legitimate state interest, not because it" is attached to a particularly harsh penalty. *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 137 (1992); *see also id.* at 136 ("A tax based on the content of speech does not become more constitutional because it is a small tax.").

Defendants contend that the Policy is similar to other permitting requirements that have been upheld by other courts. But the few cases Defendants cite serve only to underscore the Policy's unconstitutional defects. First, the permitting requirement at issue in *Bowman v. White* applied only to "non-University [e]ntities," and even that policy did not "regulate one-on-one conversations." 444 F.3d 967, 972 (8th Cir. 2006). Likewise, *Bloedorn v. Grube* involved a permitting policy that applied only to "outside, non-sponsored speakers" who wished to speak on campus. 631 F.3d 1218, 1225 (11th Cir. 2011). Here, in sharp contrast, NC State's Policy applies to students, who are entitled to the full First Amendment rights on campus, *see Widmar*, 454 U.S. at 267 n.5, and the Policy is so intrusive as to cover even the sort of one-on-one conversations the Defendants have targeted in this case.

*Riemers v. State ex rel. University of North Dakota* is likewise inapposite as the University of North Dakota required a permit only for the limited act of collecting signatures, whereas NC State's Policy applies to any type of written and most types of oral communication. 767 N.W.2d 832, 835 (N.D. 2009). Finally, *Alabama Student Party v. Student Government Association of the University of Alabama* likewise involved restrictions on only a narrow band of expressive conduct, namely student government electioneering. 867 F.2d 1344, 1345 (11th Cir. 1989). Moreover, the divided court did not apply a traditional First Amendment analysis, but rather held that the relevant "question is whether it is unconstitutional for a university, which need not have a student government association at all, to regulate the manner in which the Association runs its elections."

*Id*. at 1346. Defendants, in contrast, admits that their decision to impose a prior restraint on a wide swath of student speech must be analyzed under traditional First Amendment principles.

**3. The Policy does not leave open ample alternatives for communication.**

Grace explained how NC State's wide-ranging prior restraint fails to provide ample alternative channels of communication. Mem. 24-25. Defendants respond that if Grace members want to exercise their First Amendment rights, they can knuckle under and obtain a permit. Resp. 18. But that is no answer to the constitutional problem here, for as Defendants must concede, the Policy "fails to provide ample alternative means of communication for people wishing to participate in spontaneous" speech, which by definition is prohibited by the Policy. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1038 (9th Cir. 2008).

Recognizing this flaw, Defendants offer the trite observation that "to the extent the issue is the permitting process in general, there are many off-campus locations where students groups and others can (and do) solicit students." Resp. 18. But of course students can leave campus to exercise their First Amendment rights. And if the State of North Carolina imposed similar restrictions on its residents, they too would be free to travel to another state (or country) to speak freely. Yet that would be no defense to such a broad prior restraint, nor is it a defense here, for "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State*, 308 U.S. 147, 163 (1939).

**C. NC State has used the Policy to discriminate against Grace.**

Defendants contend that the Policy has not been applied discriminatorily against Grace because "religious groups of all types regularly receive permits." Resp. 20. But Grace has shown that the Policy has been used to discriminate against Grace's members, not based on whether they receive a permit, but rather on how Defendants have selectively enforced the Policy, targeting Grace's message while repeatedly turning a blind eye to non-permitted speech by other students

and groups. Compl. ¶¶ 87, 94, 100-112. Defendants speculate that perhaps those other speakers were engaged in University academic activities or "did not come to administrators' attention." Resp. 16. But on at least two occasions, Willis was present when other groups were engaged in non-permitted speech. Compl. ¶¶ 110, 112. And Giancola expressed particular interest in the religious content of groups' messages, explaining to Grace and other members of the now-defunct Chaplains' Cooperative Ministry ("CCM") that "[s]olicitation is not allowed when conversation is initiated under one pretense different from the intended purpose ... inviting involvement in a certain ministry." *Id*. ¶ 94. These events, when viewed alongside NC State's contemporaneous decision to end its long-standing relationship with CCM for having too many Christian groups, is powerful evidence that NC State has imposed its Policy against Grace in a discriminatory manner, violating its members' rights under the First and Fourteenth Amendments.

## II. Grace will continue to be irreparably harmed absent immediate relief.

Defendants argue that Grace will not suffer irreparable harm from the Policy's unconstitutional limits on Grace's members' speech because the school grants them ample other opportunities to speak if they first ask permission. Resp. 6-7. And Defendants assert that Grace has not explained what threats its members face for continuing to violate the Policy. *Id*. at 7-8. But as explained above, it is no answer for Defendants to assert that Grace members must simply accept that their rights will remain curtailed, and Grace has pointed repeatedly to NC State regulations that allow for severe sanctions of students and groups who violate school policies. Finally, Defendants' arguments are beside the point, as the law is clear: "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 190 (4th Cir. 2013). Because Grace is likely to prevail on its claims, it has also established a likelihood of irreparable harm.

## III. Allowing Grace students to speak about their faith will not harm NC State.

Defendants explain that the Policy helps NC State promote safety, "control large gatherings," arrange for security, and advance other related interests. Resp. 8. But Defendants do not assert that NC State cannot further these interests through alternative means, nor do they explain why the school needs to ban spontaneous speech or efforts by one or two students to speak in public places on campus. And as the Fourth Circuit has recognized, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (quotation marks omitted). The Court should follow this principle and enjoin application of the current Policy.

## IV. Protecting First Amendment rights at NC State will promote the public interest.

Defendants assert that it is in the public interest that NC State "succeed in its educational mission" and that its "policies … be enacted through deliberation and debate." Resp. 21. But the Policy "risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life," which undercuts NC State's educational mission. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 836 (1995). And NC State can consider how to modify the Policy while the Court protects Grace's rights with an injunction. Such action "upholding constitutional rights surely serves the public interest." *Giovani Carandola*, 303 F.3d at 521.

## CONCLUSION

Grace respectfully requests immediate relief in the form of a preliminary injunction.

Respectfully submitted this 31st day of May, 2016,

By: /s/ Edmund G. LaCour Jr.

EDMUND G. LACOUR JR.
District of Columbia Bar No. 1030165
**BANCROFT PLLC**
500 New Jersey Avenue, NW, Seventh Floor
Washington, D.C. 20001
(202) 234-0090
(202) 234-2806 FAX
elacour@bancroftpllc.com

DAVID A. CORTMAN
Georgia Bar No. 188810
TRAVIS C. BARHAM
Georgia Bar No. 753251
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
dcortman@adflegal.org
tbarham@adflegal.org

DAVID J. HACKER
California Bar No. 249272
**ALLIANCE DEFENDING FREEDOM**
101 Parkshore Drive, Suite 100
Folsom, California 95630
(916) 932-2850
(916) 932-2851 Fax
dhacker@adflegal.org

TYSON C. LANGHOFER
Arizona Bar No. 032589
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th St.
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
tlanghofer@adflegal.org

CHRISTIAN E. DYSART
Bar No. 36734
**DYSART LAW**
507 N. Blount St.
Raleigh, North Carolina 27604
(919) 747-8380
(919) 882-1222
Christian@cedysart.com
Local Civil Rule 83.1 Counsel for Plaintiff

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of May, 2016, I caused the foregoing paper to be served upon all defendants pursuant to Fed. R. Civ. P. 5(b).

s/Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Attorney for Plaintiff*